IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>                        Plaintiff,<br><br>    v.<br><br>CLAUD R. KOERBER<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR RECONSIDERATION AND GRANTING MOTION TO SUPPRESS**<br><br>Case No. 2:09-cr-00302<br><br>Judge Clark Waddoups |

Defendant filed his Motion to Suppress (Dkt. No. 258) on April 13, 2012. The court heard three days of evidence on the Motion to Suppress on November 8, 14, and 28, 2012, and oral argument on April 18, 2013. The parties filed lengthy post-hearing briefs on the Motion to Suppress, including supplemental memoranda relating to a specific legal issue raised during oral argument. In response to material in the Government's Response to Defendant's Supplemental Authorities and Briefing (Dkt. No. 338), Defendant moved to reopen the evidentiary hearing on the Motion to Suppress to question certain witnesses about information and guidance that the Government had obtained from Department of Justice ("DOJ") ethics advisors or the U.S. Attorney's Office's internal professional responsibility liaison—material as to which Defendant argued the Government had now waived privilege as asserted at the earlier evidentiary hearings. (*See* Def.'s Mot. Reopen Ev. Hrg. [Dkt. No. 340].) After Defendant's Motion to Reopen was fully briefed, the court granted the motion on May 31, 2013. (Dkt. No. 345.) The Government moved to reconsider. (Dkt. No. 349.) With the Motion for Reconsideration fully briefed, the court now disposes of that Motion together with the Motion to Suppress, denying the Motion for

Reconsideration (Dkt. No. 349) but nevertheless vacating as moot its Order (Dkt. No. 345) and granting the Motion to Suppress (Dkt. No 258). The court also therefore vacates as moot Defendant's Motion to Compel (Dkt. No. 346) and terminates the Government's Motion in Limine (Dkt. No. 292) as moot.

## I.      MOTION FOR RECONSIDERATION

The court granted Defendant's Motion to Reopen Evidentiary Hearing (Dkt. No. 340) on May 31, 2013 (the "Order"). (Dkt. No. 345.) On June 21, 2013, after Defendant filed a Motion to Compel the information the court required the Government to produce in the Order (Dkt. No. 346), the Government filed a Motion for Reconsideration of Order Reopening Evidentiary Hearing and Production of Discovery on Defendant's Motion to Suppress. (Dkt. No. 349.) The court has carefully reviewed the briefing relating to the Government's Motion for Reconsideration and has concluded that it is without merit, though it also vacates its May 31, 2013 Order as moot, in the interest of judicial economy, because it is ready to rule on the Motion to Suppress (Dkt. No. 258) based on the extensive briefing, transcripts, and oral arguments.

### A.      Background

In his Motion to Reopen Evidentiary Hearing (Dkt. No. 340), Defendant provided substantive argumentation of law and fact on the issue of whether the Government had waived privilege under the "sword and shield" doctrine. Previously, during the evidentiary hearing on Defendant's Motion to Suppress (Dkt. No. 258), the Government had objected to Defendant's questions surrounding the context of an email used to refresh the recollection of Jennifer Korb, a Government witness who is a former Special Assistant United States Attorney, based on the attorney-client privilege, work product doctrine, and deliberative process privilege. Although the court initially overruled the objection, the Government only produced one page containing the

undated email that Ms. Korb had written in December 2008 to the U.S. Attorney's Office's internal liaison for ethics and professional responsibility queries, Ms. Elizabethann Stevens, arguing that this page alone had refreshed Ms. Korb's recollection. The email related to the "Rule 4.2 issue" prosecutors had apparently identified in their preparation to instruct investigators to contact Defendant directly about the subject matter of their investigation. Later in the evidentiary hearing, Defendant was again denied the opportunity to inquire into the substance of any response or opinion received from the DOJ ethics advisors or professional responsibility experts based on the Government's assertion of privilege.

In supplemental briefing surrounding a separate legal issue raised during oral argument on the Motion to Suppress—whether and to what extent courts have allowed investigators (or prosecutors through investigators as their de facto alter egos) to contact represented targets of their investigations for direct questioning in seemingly innocuous interviews (as opposed to covert or undercover contact through informants)—the Government argued that even if Rule 4.2 applied, it had not violated the Rule, and it had actually done more than required to protect Defendant's liberty interests by taking "steps not required by the Constitution, federal statutes or the rules of ethics." (Pl.'s Resp. to Def.'s Suppl. Auth. and Brief. 9 [Dkt. No. 338].) In fact, argued the Government, "the prosecutors consulted with ethics advisors before the agent [FBI Agent Saxey] arranged the interviews." (*Id.*) Moreover, argued the Government, "[d]espite Defendant's unsupported assertion to the contrary, the *only* record support establishes that Agent Saxey did *not* take steps to arrange the interviews until prosecutors received this information and guidance from DOJ ethics advisors." (*Id.* at 9 n.3.) In his Motion to Reopen Evidentiary Hearing, Defendant then analyzed these statements as an assertion by the Government that it had relied on the advice of counsel—on the referenced "information and guidance from DOJ ethics

advisors"—in its decision to proceed with the *ex parte* contact and questioning of Defendant as the target of its investigation whom it intended to prosecute despite its awareness that he was represented by counsel. (*See, e.g.*, Def.'s Mot. Reopen Ev. Hrg. 9-11 [Dkt. No. 340].) In other words, Defendant argued that the Government was now using the DOJ guidance as an argumentative sword despite having previously invoked privilege surrounding this advice as an evidentiary shield to prevent Defendant from eliciting testimony about any response to Ms. Korb's December 2008 email to Ms. Stevens with the subject line "Rule 4.2 issue." (*Id.*)

In its Opposition, the Government filed a brief containing one sentence addressing the Motion: "Defendant made an erroneous assertion at oral argument (Tr. 4/18/13 at 22-24) and the government responded to that statement—nothing more." (Pl.'s Resp. to Def.'s Mot. Reopen Suppr. Hrg. 1 [Dkt. No. 342].) The pinpoint citation to the hearing transcript, however, was not on point and related to discussion between the court and Defendant's counsel about the significance of Defendant's keys having been taken from him as a result of being attached to his cell phone with a carabiner. In its Motion for Reconsideration, the Government twice acknowledged that its "initial response to defendant's motion to reopen was purposefully brief." (Pl.'s Mot. Reconsider 1-2 & n.3 [Dkt. No. 349].)

**B.  Analysis**

The Federal Rules of Criminal Procedure do not technically authorize a motion for reconsideration, but the Supreme Court has recognized a place for motions for reconsideration in criminal proceedings and has "noted the 'wisdom of giving district courts the opportunity promptly to correct their own alleged errors.'" *United States v. Randall*, 666 F.3d 1238, 1241-1242 (10th Cir. 2011) (quoting *United States v. Dieter*, 429 U.S. 6, 8 (1976)). Relief under this de facto procedure is discretionary, *id.* at 1243 n.6, by analogy to the Federal Rules of Civil

Procedure. *United States v. Barajas-Chavez*, 358 F.3d 1263, 1266 (10th Cir. 2004) (noting that appellate review of a court's disposition of a motion for reconsideration under criminal procedure is for an "abuse of discretion" by analogy to the prevailing standard under the rules of civil procedure.) Although motions for reconsideration are also not specifically provided for under the Federal Rules of Civil Procedure, courts entertain them under Rule 54(b), if they are interlocutory, or under Rule 60(b), if they are final. *See Raytheon Constructors v. Asarco Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003). In considering the merits of a motion for reconsideration in a criminal case, analogizing to analysis of such motions in civil cases also provides guidance.

The Tenth Circuit has affirmed that "revisiting" issues in a motion for reconsideration that have already been addressed in the initial briefing "is not the purpose of a motion to reconsider"; more importantly, "advancing new arguments or supporting facts which were otherwise available for presentation when the original . . . motion was briefed" is "inappropriate." *Van Skiver v. United States*, 952 F.2d 1241, 1242 & 1244 (10th Cir. 1991) (internal quotation marks and citations omitted). The *Van Skiver* Court, in fact, did not address the merits of the motion to reconsider because the moving party had failed to demonstrate any basis for relief under Rule 60(b) of the Federal Rules of Civil Procedure. *Id.* "Relief under Rule 60(b) is discretionary and is warranted only in exceptional circumstances" such as those listed in Rule 60(b). *Id.* (quoting *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co.*, 909 F.2d 1437, 1440 (10th Cir. 1990)).

Defendant is correct in identifying the Government's admission that its initial one paragraph response was "purposefully brief" as fatal to its Motion for Reconsideration. (*See* Def.'s Opp. Mot. Reconsider 4 [Dkt. No. 358].) "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously

unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). No such grounds are present here. "Motions to reconsider are not to be used as a second chance when a party has failed to present its strongest case in the first instance." *Sec. Serv. Fed. Credit Union v. First Am. Mortgage Funding, LLC*, 906 F. Supp. 2d 1108, 1111 (D. Colo. 2012). All of the legal arguments and facts presented by the Government in its Motion for Reconsideration were available to it at the time it chose to file its one paragraph Response to Defendant's Motion to Reopen the Evidentiary Hearing. The Government should have made those arguments at that time but chose to file one substantive sentence in response instead. A Motion for Reconsideration cannot be used to correct this strategic error. *See Servants of the Paracletes*, 204 F.3d at 1012.

Moreover, the court is compelled to address the Governments' repeated assertion that its Order manifested "clear error" in its interpretation of the Government's statements about relying on "information and guidance from DOJ ethics advisors" and in its review of the record. The Government's statements in its Supplemental Brief (Dkt. No. 338) and the context in which they were made speak for themselves. The court agrees that Defendant's description accurately describes the context and meaning of those statements. (*See* Def.'s Opp. Mot. Reconsider 2 [Dkt. No. 358] ("The government purposefully made those assertions in the context of trying to persuade the Court that its actions were 'authorized by law' and explicitly as a defense to the 'outrageous[ness]' of its misconduct under Fifth Amendment due process considerations.").)

In its Response to Defendant's Motion to Reopen the Evidentiary Hearing, the Government cited to pages 22 to 24 of the April 18, 2013 hearing transcript in support of its one sentence argument there that it had only made the contested statements in its Supplemental Brief to correct Defendant's misrepresentation of the record. But this pinpoint citation was wholly

inapplicable to the question at hand. Then, in its Motion for Reconsideration, the Government redirected its accusation that Defendant had misrepresented the record to page 29 of the April 18, 2013 hearing transcript. The sentence that the Government claims constitutes Defendant's misrepresentation of the record is Defendant's argument there that "[t]he government in this case didn't even wait for their own Office of Professional Conduct to give them an answer, didn't seek court approval, didn't seek a written waiver." (Tr. Hrg. 4/18/13, at 29:22-25 [Dkt. No. 324].) The Government indisputably did not seek court approval or a written waiver from Defendant's various attorneys to make *ex parte* contact with him. And as to Defendant's counsel's assertion that the Government "didn't even wait for their own Office of Professional Conduct to give them an answer" in response to Ms. Korb's email with the subject line "Rule 4.2 issue," the court finds that this was not a misrepresentation of the record but rather a reasonable inference drawn by Defendant's counsel based on the deficient evidentiary record resulting from the Government's repeated assertion of privilege, which the court upheld, each time Defendant's counsel tried to inquire about the response, if any, to Ms. Korb's email. The court rejects the Government's arguments that, hoodwinked by Defendant's alleged misrepresentations of the record and analysis, the court ruled in his favor on his Motion to Reopen the Evidentiary Hearing. As noted, the context of the Government's contested statements speaks for itself (*see* Pl.'s Resp. to Def.'s Suppl. Auth. and Brief. 9 & n.3 [Dkt. No. 338]), as does the voluminous record, and the court's interpretation of both in granting the Motion to Reopen was not "clear error."

Though the court therefore DENIES the Government's Motion for Reconsideration, it nevertheless also VACATES as moot, in the interest of judicial economy, its May 31, 2013 Order (Dkt. No. 345) compelling the reopening of the evidentiary hearing and the production of

the materials as to which the Government waived its asserted privilege. The court has carefully reviewed the extensive briefs, transcripts, and oral arguments relating to Defendant's Motion to Suppress and is ready to grant that motion on the basis of this extensive documentation, without needing to expend the court's valuable time and resources in such a reopened hearing.

## II.     MOTION TO SUPPRESS

The court must consider what consequences, if any, follow a lead prosecutor's instructions to federal investigators to initiate pre-indictment *ex parte* contact with the target of their investigation who prosecutors know is represented by counsel, and to conduct multiple interviews of that person, including through use of questions scripted by the prosecutors and designed to influence the target to waive attorney-client privilege and disclose information about potential trial strategy such as reliance on an "advice of counsel" defense. In doing so, the court must evaluate a relatively unique factual scenario and address abundant but in many cases inapposite case law.

### A.     Outcome Summary

As discussed in more detail below, the court finds, as a preliminary matter, that the Government knew that Defendant was represented by counsel at the time it conducted two *ex parte* interviews with him in February 2009. Although the court believes that under the unique factual circumstances present in this case, the posture of the Government toward Defendant had shifted from investigatory to prosecutorial by February 2009 (even though Defendant had not yet been technically indicted by that time), the court need not analyze in detail whether Defendant's Sixth Amendment right to counsel had therefore "attached" for suppression purposes because it finds that Defendant voluntarily waived that right in the noncustodial, pre-indictment interviews under recent, controlling Supreme Court precedent. But based on the prosecutors' actual

knowledge that Defendant was represented, they violated Rule 4.2 of the Utah Rules of

Professional Conduct in authorizing the agents to contact him directly and conduct the interviews

with him without obtaining consent from his counsel or court approval. An amendment to Utah's

Rule 4.2 in 2005 has unpegged the consideration of the Rule's application from principles

governing the Sixth Amendment right to counsel analysis, resulting in a broadening of the Rule's

applicability as to overt, pre-indictment, noncustodial *ex parte* contact. As a violation of the no-

contact rule, the *ex parte* contact at issue here also constituted a violation of a federal statute—

the Citizens Protection Act (the "Protection Act"), 28 U.S.C. § 530B—enacted in 1999 to ensure

that U.S. Attorneys and those in their offices, and any other attorney for the Government,

conform to the local ethics rules applicable in their jurisdictions of practice. Thus, as a departure

also from publicly known internal policies of the DOJ, FBI, and IRS meant to protect citizens'

rights, the statutory ethics violation amounts to a denial of due process under the Fifth

Amendment for which exclusion is the appropriate remedy under the unique facts of this case.

### B.      Factual Background

Defendant voluntarily appeared for two interviews with IRS Agent Ronald Marker and

FBI Agent Cameron Saxey on February 13, 2009 and February 26, 2009. The interviews related

to Defendant's alleged role in a "white collar crime case involving wire fraud, securities fraud,

and some tax violations." (Email from J. Korb to E. Stevens, admitted as Gov. Ex. 6 at 11/8/12

Ev. Hrg.) The allegations against Defendant were the focus of a joint investigation and

prosecution among the DOJ, the Utah Division of Securities, the FBI, and the IRS that had been

in motion in one form or another since 2005, with the U.S. Attorney's Office taking over in

approximately February of 2008. Assistant U.S. Attorney Stewart Walz and his colleagues in the

prosecutors' office authorized the interviews, which were recorded. In the second interview, the

agents posed half a dozen scripted questions provided by the prosecutors, including questions designed to induce Defendant, who was the target of their investigation and whom prosecutors intended to indict, to waive attorney-client privilege and to reveal potential trial strategy such as whether he intended to rely on an "advice of counsel" defense at trial, though he was as yet unindicted. Defendant's statements during these two interviews were integral to the indictment returned against him on May 26, 2009.

**Development of the Investigation**

Defendant has been a target of this investigation since 2005. At that time, Ms. Jennifer Korb, then an attorney with the Utah Division of Securities (the "Division"), was participating in the investigation on behalf of the Division. At some point during this Division investigation, she also became "cross-designated" as a Special Assistant United States Attorney ("SAUSA") to assist the U.S. Attorney's Office in prosecuting cases. According to Agent Marker, the IRS investigation of Defendant began in 2006. In late 2007, Ms. Korb began coordinating with the U.S. Attorney's Office and the IRS, through Agent Ronald Marker, on the investigation. By early 2008, the Utah Attorney General ultimately decided not to file the case against Defendant. The U.S. Attorney's Office then took charge of the investigation in approximately February 2008, and AUSA Walz was assigned to be lead counsel with assistance, initially, from AUSA Trey Mansfield. Ms. Korb continued in her cross-designated role on the team of prosecutors involved in the investigation. FBI Agent Cameron Saxey was assigned to work on the case in early 2008. IRS Agent Marker testified that he "joined the grand jury investigation in early 2008" in order to continue pursuing the tax evasion angle of the "securities fraud and possibly money laundering" investigation that he had led since 2006. (Tr. Ev. Hrg. 11/14/12, pt. 1, at 13:17-18; 22:1-2, 8-10 [Dkt. No. 304].) Ms. Korb, FBI Agent Saxey, and IRS Agent Marker

have all testified that the current charges against Defendant stem from the initial state investigation as carried over to the federal investigation in February 2008.

**Representation in Early Stages of the Investigation**

IRS Agent Ronald Marker opened the IRS investigation against Defendant in 2006 and first met him when he visited Defendant's Provo offices with four to six other IRS agents to interview him in March 2007. At that time, attorney Russell Skousen was asked to leave the room while Defendant was read the obligatory *Miranda*-like "noncustodial statement of rights" required by internal IRS policies to be given when questioning a target of an IRS investigation, which included the statement "I advise you further that you may, if you wish, seek the assistance of any attorney before responding." Defendant invoked his right to have counsel present and asked Mr. Skousen back into the room as his counsel, telling Agent Marker that they preferred to wait until another attorney, Jeffery Thompson, arrived, though Defendant and Mr. Skousen were willing to answer some preliminary questions in the meantime. Based on this interaction, Agent Marker testified that he believed that Defendant "was represented by Skousen and Thompson." (*Id.* at 11:19-20.) FBI Agent Saxey testified that once he was assigned to the team in early 2008, he became aware of what had transpired in March 2007 between Agent Marker and Defendant's counsel. (Tr. Ev. Hrg. 11/8/12, at 53:11-14 [Dkt. No. 301].) In fact, by February 15, 2008, Agent Saxey had been made aware of Mr. Skousen's representation of Defendant. (*Id.* at 66:21-67:21.)

Agent Marker also remembered discussing a further attorney, Robert Smith, who was "a tax attorney who was privy to Mr. Koerber's tax situation" and, in fact, he contacted Mr. Smith in August 2007. (Tr. Ev. Hrg. 11/14/12 pt. 1, at 15:9-10; 16: 7, 19-24 [Dkt. No. 304].) Defendant's attorney Mr. Smith, however, refused to speak with Agent Marker at that time because "Mr. Wheeler advised him not to speak with [Agent Marker]." (*Id.* at 17:12-13.) Agent

Marker understood that this referred to Max Wheeler, a local criminal defense attorney, who he came to understand was representing Defendant "somewhere around this time" in August 2007. (*Id.* at 18:8-9.) Agent Marker also became aware "somewhere along the line" that Defendant "had sought some representation from Randall MacKay" pertaining to issues of securities law during the course of the investigation. (*Id.* at 19:4-6.) Between March 2007 and February 2009, Agent Marker "spoke to Mr. Wheeler and perhaps one of his associates a couple times" and to "Mr. Skousen on occasion." (*Id.* at 19:15-17.) Agent Marker is of the opinion that his investigation beginning in 2006 and continuing on into the grand jury investigation after the U.S. Attorney's Office had taken charge of the matter in February 2008 "eventually led to some of the charges that Mr. Koerber faces" under the current Indictment and that, in fact, even the March 2007 meeting at Defendant's offices "played a role in the ultimate indictment." (*Id.* at 7:11-14; 13:11-13.)

**Representation After U.S. Attorney's Office Took Over Investigation**

In March 2008, prosecutors from the U.S. Attorney's Office began laying the groundwork for the indictment they intended to seek against Defendant by issuing a grand jury subpoena shortly after having taken over the matter from Utah's Attorney General's Office, calling Defendant to testify as the putative document custodian for his now defunct businesses. Defendant's counsel Max Wheeler responded to the subpoena on March 21, 2008 on his law firm's letterhead in correspondence addressed to Brett Tolman, the U.S. Attorney at the time, and copied to AUSA Walz. In the letter, Mr. Wheeler first referred to correspondence dated March 12, 2008 between himself and AUSA Walz on issues relating to his representation of Defendant in this matter. He then stated that

> It is our understanding that Mr. Koerber is the subject/target of the grand jury's investigation. While the government seeks Mr. Koerber's appearance before the

grand jury as a "custodian of records," his appearance would in reality be in his personal capacity. As you know, calling a subject/target before a grand jury rarely, if ever, occurs because of the prejudice that is certain to result, particularly when, as will be the case here, the witness invokes his Fifth Amendment rights and refuses to answer any questions. . . .

In my thirty-nine years of practice, I have never seen the government compel a subject/target to testify before the grand jury in any capacity when it was informed beforehand that the witness intended to invoke his Fifth Amendment rights. In my opinion, if the government insists on subpoenaing Mr. Koerber before the grand jury, it would constitute grand jury abuse, especially when other methods for obtaining the records are available, and in this case, where numerous documents have already been produced by company counsel to the State Division of Securities, the agency cooperating with your office in this investigation. Furthermore, the IRS has been given virtually all of the company records pursuant to a summons it issued several months ago. . . .

If the government still seeks Mr. Koerber's appearance before the grand jury, I would request, as indicated in your letter, that you issue a new subpoena to Mr. Koerber personally. While I do not agree with such an approach, I am willing to accept the new subpoena on his behalf.

(March 21, 2008 Letter from M. Wheeler to U.S. Attorney Tolman, admitted as Def. Ex. H at

11/8/12 Ev. Hrg.)

AUSA Walz knew Mr. Wheeler was representing Defendant even before the March 2008

correspondence. He testified that "[a]t the time I got the case, my understanding was that

[Defendant] was represented by Max Wheeler of Snow Christensen & Martineau," that Mr.

Wheeler "had represented Mr. Koerber in responding to an IRS summons for records," and that

"he was representing Mr. Koerber for a period of time." (Tr. Ev. Hrg. 11/8/12, at 191:14-19

[Dkt. No. 301].) In fact, based on this knowledge, AUSA Walz contacted Mr. Wheeler

"sometime in 2008" to ask Mr. Wheeler to advise his client not to contact the agents on the

matter after Defendant had attempted to call Agent Marker. (*Id.* at 192:1-9.) Agent Marker

remembers this having happened in "late 2008," though he could not be certain. (Tr. Ev. Hrg.

11/14/12, pt. 1, at 34:4-5 [Dkt. No. 304].) In approximately the Fall of 2008, "or maybe a little

later," AUSA Walz denied a request by Agent Saxey for permission to interview Defendant with Agent Marker because he wanted to contact Defendant's counsel first. (Tr. Ev. Hrg. 11/8/12, at 50:11-17 [Dkt. No. 301].) AUSA Walz therefore instructed Agent Saxey not to proceed until he reverted with more information. (*Id.* at 78:5-9.) Agent Saxey recalls AUSA Walz telling Ms. Korb "to do some things and then contact someone back in Washington" and then instructing the agents that the prosecutors would let them know if and when the agents could contact Defendant for such an interview. (*Id.* at 50:21-24.)

**Recognition of "Rule 4.2 Issue" as a Result of Defendant's Representation**

Ms. Korb also testified about a meeting among this group on the joint prosecution/investigative team (AUSA Walz, SAUSA Korb, and Agents Saxey and Marker) in early December 2008 in which AUSA Walz said he wanted the agents to contact Defendant. AUSA Walz instructed Ms. Korb to "call [Mr. Wheeler] just to check in and see if he was representing Mr. Koerber." (*Id.* at 173:14-15.) As directed, she called Mr. Wheeler on December 4, 2008. At first, Ms. Korb testified that she asked if Mr. Wheeler represented Defendant and he said he did not and that he had not spoken with Defendant in "many months." (*Id.* at 149:6-10.) On cross-examination and after having her recollection refreshed with an email she wrote shortly after the phone call, she clarified that she asked him whether he had been *retained*, to which he replied, "No, I haven't yet." (*Id.* at 175:19-23.) Ms. Korb reported back to AUSA Walz who then instructed her to write an email to the U.S. Attorney's Office's internal Professional Responsibility Officer, Ms. Elizabethanne Stevens, to seek guidance on the "Rule 4.2 issue" (as highlighted in the subject line of the email) that he had recognized in the situation, given his knowledge of Mr. Wheeler's representation of Defendant since at least March 2008. (*Id.* at

177:7-11; 230:9-19; Email from Ms. Korb to Ms. Stevens, admitted as Gov't. Ex. 6 at 11/8/12 Hrg.)

Ms. Korb's testimony on cross-examination was consistent with the email, in which she had written that she had asked Mr. Wheeler whether he had been retained to which he had replied that he had not and had not spoken with Defendant in six months. (Gov't. Ex. 6.) She also wrote that Mr. Wheeler had offered to get a message to Defendant and had suggested that the Government could also contact Defendant's other attorney Russell Skousen. Ms. Korb also stated in the email that her supervisor in the Utah Division of Securities had mentioned another attorney, Randy Mackey, representing Koerber in negotiations about a possible administrative/criminal action in early 2007. (*Id.*) Upon questioning from the court, Ms. Korb acknowledged that she had never made a distinction between Mr. Skousen representing Defendant or Defendant's businesses as "corporate counsel. (Tr. Ev. Hrg. 11/8/12, at 186:20-25 to 187:1-4 [Dkt. No. 301].)

**Failure to Ask for Mr. Wheeler's Consent or Contact Defendant's Other Counsel**

Mr. Wheeler testified that in late 2008 Defendant was "substantially in arrears financially with our firm" and that he told AUSA Walz at the time (when AUSA Walz called him to request that he advise Defendant not to contact Agent Marker) that he had not spoken to Defendant for a "number of months" and mentioned that he personally "would not be working on the Koerber file going forward . . . because I hadn't spoken with him." (Tr. Ev. Hrg. 11/28/12, at 9:1-4; 9-12 [Dkt. No. 305].) Mr. Wheeler clarified that he "never ceased representing [Defendant] but I ceased doing work on the file." (*Id.* at 28:17-19.) And Mr. Wheeler explained that he had told Ms. Korb in the December 4, 2008 telephone call that Defendant "is represented by other counsel," referring "specifically to Mr. Skousen and suggested that she call Mr. Skousen because

he was represented by a number of different lawyers." (*Id.* at 9:15-18.) Billing records from Mr. Wheeler's law firm show that in addition to his own time, at least two other attorneys within his firm, R. Van Wagoner and S. Harkness, worked on the file "IRS investigation" under the name Rick Koerber, with billing entries from all three covering the period from March 2007 to December 2009. (*See* Billing Records attached as Ex. 1 to Def.'s Mot. Suppl. Record, at e.g. 52, 54 [Dkt. No. 311-1].)

In her brief telephone call with Mr. Wheeler, Ms. Korb did not "ask for his consent to interview or speak with [Defendant] outside of [Mr. Wheeler's] presence," and she did not recall anyone else requesting Mr. Wheeler's consent to contact Defendant outside of his presence. (Tr. Ev. Hrg. 11/8/12, at 185:22 to 186:9 [Dkt. No. 301].) Moreover, Mr. Wheeler did not recall anyone from the U.S. Attorney's Office informing him of the intention to make *ex parte* contact with Defendant or requesting his consent to do so. (Tr. Ev. Hrg. 11/28/12, at 10:7 [Dkt. No. 305].) "Had it been," testified Mr. Wheeler, "I would have immediately called [Defendant] and told him not to do it. But I did not understand he was going to go in there unrepresented and talk to government agents. . . . In 45 years of practice, I have never given my permission to let a client talk to the government without counsel present if they were targets." (*Id.* at 10:7-16.) And although Mr. Wheeler had referred her to Defendant's other attorney, Russell Skousen, neither she nor any other prosecutor or agent contacted Mr. Skousen about whether he represented Defendant or to request consent to interview him outside the presence of counsel. (*Id.* at 34:7-24.) For his part, Mr. Skousen "had been involved in [Mr. Wheeler's] being retained with Jeff Thompson" and "was aware that [Mr. Wheeler] was working on matters related to the indictment and so forth"; thus, he understood that Mr. Wheeler "was representing Mr. Koerber in February 2009 or around that time period." (*Id.* at 35:2-4, 7-9.)

**Purported Change in Government's Understanding about Defendant's Representation**

Two weeks after Ms. Korb called Mr. Wheeler and wrote her email relating to the "Rule 4.2 issue," both Agents Saxey and Marker still believed that, as of December 16, 2008, Defendant was represented by counsel. Agent Saxey noted this in his report of an interview he conducted with Jewel Kimber Fish, an associate of Defendant. (FBI 302 Report dated December 16, 2008, admitted as Def. Ex. B at 11/8/12 Hrg., at 5.) Agent Saxey testified that this belief as of that date was based on "reading state reports where Mr. Koerber had showed up with his attorney to visit with the state, based upon my conversations with prosecutors, and reviewing past reports, and after talking to Mr. Walz he believed at this time he was represented, that Mr. Koerber was represented." (Tr. Ev. Hrg. 11/8/12, at 73:10-16 [Dkt. No. 301].) Agent Marker testified that it was also his understanding as of December 16, 2008 that Defendant "had access to several attorneys but that Max Wheeler was his criminal defense attorney," and that he had come to consider Mr. Skousen as his personal counsel as well because at one point Defendant "said something to the effect that he takes all his initial legal questions to Mr. Skousen." (Tr. Ev. Hrg. 11/14/12, pt. 1, at 28:5-15 [Dkt. No. 304].)

Despite the Government's awareness of Defendant's representation by multiple attorneys—Russell Skousen, Jeffery Thomspon, Randall Mackey, Robert Smith, Max Wheeler— throughout the course of the investigation since at least March 2007, AUSA Walz apparently believed that by February 2009 Defendant was no longer represented by any of them in relation to this investigation and the impending grand jury proceedings. AUSA Walz decided that Defendant "did not have counsel" following a conversation he recalls with former AUSA Loren Washburn in approximately October 2008. (Tr. Ev. Hrg. 11/8/12, at 198:10-11 [Dkt. No. 301].) Mr. Washburn "came into [AUSA Walz's] office, and said, [he] just got a call from Max

Wheeler" who told Mr. Washburn that "the rumor on the street is that [Defendant] is going to be indicted, [and] although Max says he does not represent [Defendant], he would make him available should he be indicted with the elliptical clause being so we don't have to arrest him." (*Id.* at 198:12-22.) AUSA Walz did not confirm this with Mr. Wheeler. (*Id.* at 199:24-200:2.) Mr. Wheeler did not specifically remember a conversation with former AUSA Washburn to that effect but testified that it was consistent with his practice to make arrangements for a client to appear at the initial appearance upon being indicted "even if I was not going to go forward representing him during the defense of the case. I would have done what I could to make sure that a summons issued, he was not arrested, and that he had counsel to appear with him even though it would not be me." (Tr. Ev. Hrg. 11/28/12, at 20:20-24 [Dkt. No. 305].) Although Mr. Wheeler explained that this would have been his general approach where a client was indicted and he would not be continuing with the representation in the defense of the case, he also testified that he first heard the rumor from Defendant that he was going to be indicted shortly before the indictment was returned in May 2009. (*Id.* at 29:5-12.)

**Prosecutors' Authorization of the Agents' *Ex Parte* Interviews**

Agent Saxey testified that in his experience he can speak with represented targets of his investigation "when either the lawyer for the witness has consented" or when he has "been instructed by the prosecutors on the case" to contact the person. (Tr. Ev. Hrg. 11/8/12, at 64:11-18 [Dkt. No. 301].) In this case, he had been instructed by AUSA Walz to wait to contact Defendant until the prosecutors "had taken additional steps." (*Id.* at 87:11-14.) In late January 2009, one of the members of the prosecution team—Agent Saxey believes it was AUSA Walz—said that he could contact and interview Defendant because they had "received an opinion, we've talked to his attorney, something to that effect." (*Id.* at 86:1-3.) Based on this, at the beginning of

February 2009, Agent Saxey believed Defendant was no longer represented by any of the attorneys who he was aware had previously been involved in Defendant's representation. (*Id.* at 87:15-22.) AUSA Walz deferred to Agent Saxey's memory of his authorizing the first interview in February 2009. (*Id.* at 229:11-15.) With this authorization, Agent Saxey reached out to Defendant through Jewel Kimber asking Defendant to make contact with him and also left one or more voicemails on Defendant's cell phone to contact him. Exchanging voicemails, Defendant then left a message for Agent Saxey explaining that he had received Agent Saxey's voicemail and had tried unsuccessfully to reach his attorney Max Wheeler, (Tr. Ev. Hrg. 11/14/12, pt. 2, at 5:23-6:17 [Dkt. No. 303]), but that he would be willing to meet with the agents "if it was okay with Mr. Walz." (Tr. Ev. Hrg. 11/8/12, at 24:10-11 [Dkt. No. 301].) Defendant then voluntarily appeared, without counsel, at the FBI's office in Salt Lake City for the first interview with Agents Saxey and Marker on February 9, 2009.

During the February 9, 2009 interview, Agent Saxey stated that "Rick, you were represented for a while, and we're not permitted to talk to you, but in the future I plan on talking to you about what information you might have." (Tr. 2/13/09 Int., attached as Ex. 10 to Mumford Decl., at 38.) Defendant expressed immediate surprise at Agent Saxey's off-hand remark:

| | |
|---|---|
| KOERBER: | When you say I was represented for a while what do you mean? |
| SA SAXEY: | It was our uh, uh, impression that Max Wheeler was your attorney for a while |
| KOERBER: | So it's your impression that Max is not representing me? |
| SA SAXEY: | Correct. Isn't that the case? |
| KOERBER: | Well that's news to me. |
| SA SAXEY: | He is representing you? |

| KOERBER: | I haven't heard opposite. He's told me if I wanted him to continue representing me I gotta pay my bill. |
| SA SAXEY: | Uh-huh. |
| KOERBER: | But he hasn't given me a deadline for that or anything. |
| SA SAXEY: | Okay it was our impression you are not represented by Max Wheeler anymore. |
| KOERBER: | I don't know how you have that. . . . And then I got a phone call from uh, my general attorney is Russ Skousen. And he coordinates all these different attorneys. He's the one that brought Max to the table. . . . So Max sent me an email, and he said Stu Walz contacted me and wanted to know what you were doing contacting his agents. And my response was well they're contacting everybody I know. And he said look don't do that. And he said I did not tell Stu Walz I was not representing you, but you need to pay your bill. And that's the last I've heard from him. So, obviously I need to call Max. |

(*Id.* at 39-40.) At that point Agent Saxey asked Defendant if he wanted to stop the interview and

Defendant said "No I'm all right." (*Id.*) After nearly four hours of interview, however, Defendant

reiterated his surprise at the agent's belief that he was not represented: "Uh I'm surprised about

the whole Max thing. As far as I'm concerned Max still does represent me. He might be a little

pissed that I came and talked to ya." (*Id.* at 146.)

Agent Saxey became unsure about whether Defendant was, in fact, represented or not

after these comments, but he continued the interview and did nothing following the interview to

verify whether Defendant was represented. Agent Saxey explained that he "trusted Mr. Walz and

the prosecutors I was working with" as to their position on whether Defendant was represented

when they had instructed the agents to proceed with the *ex parte* interview. (Tr. Ev. Hrg.

11/8/12, at 97:6-7 [Dkt. No. 301].) Agent Marker confirmed that he also did nothing during or

after the first interview to verify whether Defendant was, in fact, represented by any of the

Defendant's attorneys of whom he had personally become aware in connection with the investigation. (Tr. Ev. Hrg. 11/14/12, pt. 1, at 41:13-20; 44:1-3 [Dkt. No. 304].) Agent Marker testified that, to his knowledge, no one on the prosecution team verified whether Defendant was represented following the first interview. (*Id.* at 44:8.)

AUSA Walz discussed the first interview with the agents before the second interview on February 26, 2009. As to the discussions between the agents and AUSA Walz after the first interview, the AUSA testified that "I'm pretty sure I asked, 'What did he say about Max Wheeler,' and he said, 'He thought he represented him.'" (Tr. Ev. Hrg. 11/8/12, at 221:5-6 [Dkt. No. 301].) Although AUSA Walz was working daily across from Mr. Wheeler on a month-long trial in February 2009, he never broached the issue with Mr. Wheeler following Defendant's statements in the first interview. Instead, AUSA Walz specifically authorized the second interview to proceed. (*Id.* at 229:6-11.) Moreover, AUSA Walz instructed Agent Saxey to ask Defendant whether he would be relying on an "advice of counsel defense" at trial (*id.* at 219:11-16), and whether he would "waive privilege in some area," a question Agent Saxey remembered well because, despite his experience, he had never heard that before. (*Id.* at 37:3-7; 131:3-14.) Also, AUSA Mayfield provided Agent Marker with five questions to ask Defendant during the second interview, including questions about Defendant's actions towards investors in Wyoming and about accountants and attorneys he had relied on. (Tr. Ev. Hrg. 11/14/12, pt. 1, at 51:10-22 [Dkt. No. 304].)

Defendant again voluntarily appeared for the second interview at the FBI's office in Salt Lake City. The agents informed him that he was not under arrest or indictment, that he was free to leave at the end of the interview, and that he was "[f]ree to stop and say you want to consult an

attorney at any time." (Tr. 2/26/09 Int., attached as Ex. 10 to Mumford Decl., at 2.) Defendant proceeded voluntarily with the interview after receiving this statement.

### C. Findings of Fact and Legal Analysis

#### 1. *Dispositive Findings of Fact Relevant for Legal Analysis*

The Factual Background above substantiates the salient, dispositive facts that shape the court's legal reasoning in granting Defendant's Motion to Suppress, as follows.

##### a. *The Government Was Aware of Defendant's Representation.*

The testimony and other evidence in the record, together with both necessary and reasonable inferences that arise therefrom, persuade the court that the Government had actual knowledge that Defendant was represented by counsel at the time of the February 2009 interviews.

First, no doubt can exist as to the Government's actual knowledge that Defendant was represented by counsel before the second interview on February 26, 2009. Defendant expressed during the first interview on February 13, 2009 that he believed he was represented. That, at the very least, should have prompted prosecutors, or the interviewing agents, to reach out to Mr. Wheeler and Mr. Skousen, both of whom Defendant mentioned in his remarks about his representation, to confirm whether Defendant was represented and, if so, whether counsel consented to his being interviewed outside of the presence of counsel.

Second, the court finds unconvincing testimony to the effect that, despite manifest awareness that Defendant was represented by a number of different attorneys throughout the course of the investigation—an investigation on which Agent Marker had been involved since 2006 on behalf of the IRS and in the course of which he had interacted with Mr. Wheeler, Mr. Skousen, Mr. Thompson, and Mr. Smith—prosecutors formulated a belief at some point after

December 16, 2008 that Defendant was no longer represented by any of these attorneys. The conversation AUSA Walz remembers with former AUSA Washburn in approximately October 2008 is unreliable in the face of more credible contrary testimony and evidence that Mr. Wheeler did not hear rumors about any indictment until shortly before May 2009 and that Agent Saxey believed, based on discussions with prosecutors, that AUSA Walz still believed as of December 16, 2008 that Defendant was represented. Moreover, even if the conversation with Mr. Washburn did occur in October 2008 and proceeded as AUSA Walz remembers, this does not support a reasonable inference that Defendant was not in fact represented, even by Mr. Wheeler. Stating that he would not be continuing to represent Defendant by defending him in the case after the indictment is not the same as Mr. Wheeler saying that he does not currently represent him. It also does not mean that other attorneys in his firm were not at that time or would not be representing him after the initial appearance. Billing records show that Defendant was indeed a client of the firm throughout this entire time period, with two other attorneys besides Mr. Wheeler submitting timesheets to the matter, though Defendant was admittedly behind in paying his fees. Perhaps one of them would have taken the matter forward after the initial appearance. In any event, even assuming that Mr. Wheeler meant that neither he nor colleagues in his firm who were currently billing to the matter would be representing Defendant after the initial appearance or even that they were no longer representing him at present (in October 2008), which was not the case, this does nothing to address Defendant's representation by Mr. Skousen or the other attorneys of whom the team, particularly Agent Marker (and through him Agent Saxey), was aware. Neither AUSA Walz nor anyone from the prosecution team or the investigation team confirmed with any of those other attorneys whether they were representing Defendant.

Third, when AUSA Walz instructed Ms. Korb at the beginning of December 2008 to check in with Mr. Wheeler about his representation of Defendant because he wanted the agents to be able to interview Defendant, Ms. Korb's query as to whether Mr. Wheeler had been retained did not address the question of whether he was currently representing Defendant. From the record it appears likely that Mr. Wheeler was literally answering the specific question of whether he had been retained when he answered in the negative. And despite his answer that he had not yet been retained, it was open and obvious that he had been representing Defendant as to aspects of this prosecution/investigation since 2007. Though Mr. Wheeler had not yet been retained according to his answer to Ms. Korb in early December 2008, he had already intervened in the Government's attempt to subpoena Defendant as a custodian of records of his defunct companies in March 2008. His strongly worded letter of objection at that time recognized Defendant as the target of the investigation and refused to make him available to appear before the grand jury in that capacity. Nothing in the record provides the basis for a reasonable inference on the part of the Government that Defendant was no longer represented by Mr. Wheeler at any point after March 2008. To the contrary, a necessary inference from all the testimony and evidence in the record is that Mr. Wheeler or attorneys at his firm continued to represent Defendant. Defendant himself believed this when the issue was raised in the first interview on February 13, 2009. Certainly, nothing in the record indicates any reasonable basis for an inference on the part of the Government that any of the other attorneys involved in Defendant's representation throughout the course of the investigation between 2006 and February 2009 had ceased their representation. Testimony focused almost exclusively on Mr. Wheeler.

In conclusion, the simple fact is that the Government knew that Defendant was represented in this matter as early as March 2007 and reaffirmed in March of 2008 through direct correspondence with Max Wheeler. Nothing occurred at any time before February 13, 2009 that would support a reasonable inference that the representation had changed. And the record supports no inference that Mr. Skousen had ceased representing Defendant, not to mention the other attorneys with whom agents had worked and of whom prosecutors were aware. As the court mentioned during oral argument on April 18, 2013, "it would be so simple to simply call up and say, Max—they have known each other a long time—we want to interview Mr. Koerber, do you have any objection? If they had done that, we wouldn't be here today." (Tr. Hrg. 4/18/13, at 33:18-24 [Dkt. No. 324].) Nothing in the oral argument, the transcripts of the evidentiary hearings, or the voluminous rounds of briefing on this situation has persuaded the court to abandon its observation at oral argument that "the way it was approached at least allows an inference that they didn't want to get that response, they wanted to be coy and say, can we justify saying that he's not represented so we can interview him." (*Id.* at 34:2-6.) The record supports the court's inference that prosecutors intended to indict Defendant at the time they instructed the investigators to contact him and arrange the interviews, and this desire or focus rationally explains the Government's efforts to "justify saying that he's not represented so we can interview him." In any event, this only relates to Mr. Wheeler—at oral argument the court asked, "why didn't they call up Mr. Skousen and say, we want to talk to him, do you have any objection? All of this could have been avoided so simply, and they either would have said yes or no, and we would not have been here." (*Id.* at 34:8-12.) Facts responsive to this question never surfaced in either the oral argument or the briefs, except for the Government's tenuous assertion that Mr. Skousen "never indicated that he was involved in the representation in the criminal

case." (*Id.* at 34:18-19.) This response does nothing to raise an inference that he was no longer representing Defendant in this investigation as the Government was aware that he had been since at least March 2007 when Defendant told Agent Marker that he wanted his counsel Mr. Skousen present during the March 2007 meeting.

   b.     *The February Interviews Were Noncustodial.*

During oral argument, the court revealed that it was "not inclined to find on this evidence that the defendant, Mr. Koerber, was in custody during either of the interviews." (*Id.* at 4:4-6.) After carefully reviewing the post hearing briefs, the transcripts of the evidentiary hearing, and the transcripts of both February 2009 interviews, the court remains convinced that both interviews were noncustodial. Defendant voluntarily appeared, openly discussed issues with the agents, spoke most of the time, was told he was not under arrest and would be free to leave, and did leave freely at the conclusion of both interviews. No indicia of custody have emerged in the evidence or arguments. Moreover, even after Defendant raised the concern about the agents' apparent mistaken understanding that he was no longer represented by Mr. Wheeler (and referred also to his other counsel Mr. Skousen), and the agents asked him if he wanted to stop, he said that he was fine to continue.

   2.     **The Sixth Amendment**

The court need not evaluate the impact under the Sixth Amendment of the Government's *ex parte* contact in noncustodial, pre-indictment interviews with a target of its investigation whom it intended to indict because, even assuming that the Sixth Amendment right to counsel had attached, the court finds that Defendant voluntarily waived it. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. The Supreme Court, following a

long line of cases addressing the issue, has recently again reiterated that this Sixth Amendment right to counsel "does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). The Supreme Court has therefore "pegged commencement [of the right to counsel] to 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.* (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). The Supreme Court typically caveats this delineation of the right's attachment by explaining that "[t]he rule is no 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" *Id.* (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)). Once the right attaches, "the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," including "[i]nterrogation by the State." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citing *United States v. Wade*, 388 U.S. 218, 227-28 (1967)).

In *Montejo*, the Supreme Court went on to explain that "[o]ur precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Id.* Moreover, a "defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* (citing *Michigan v. Harvey*, 494 U.S. 344, 352-53 (1990)). Reiterating, "[i]n determining whether a Sixth Amendment waiver was knowing and voluntary, there is no reason categorically to distinguish an unrepresented defendant from a represented

one." *Id.* at 798. The Court observed that receiving and waiving *Miranda* rights was sufficient to waive the Sixth Amendment right to counsel as well. *Id.* at 786.

Here, Defendant was not in custody at the time of either interview. As a result, the agents were not required to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 456 (1966). The advisement of rights under *Miranda* is a prerequisite for admissibility "only where there has been such a restriction on a person's freedom as to render him in custody." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). Determining whether someone is in custody for purposes of *Miranda* is an objective test asking whether "a reasonable person would have felt free to terminate the interview and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004). Based on "all the circumstances surrounding" each of the two interviews in February, Defendant was not in custody. *Stansbury*, 511 U.S. at 322. He appeared voluntarily for both interviews and even though he was not in custody the agents explained that he was not under arrest or indictment, was free to leave at any time, and that anything he said could be used against him. When he raised an issue about his representation during the first interview, Agent Saxey asked if he wanted to stop and he said that he was fine and could continue. In the second interview, he was advised that he was free to stop at any time and say that he wanted to consult an attorney. Defendant never did so but pressed forward with the interview.

The court finds that Defendant's actions constituted a "voluntary, knowing, and intelligent" waiver of his Sixth Amendment right to counsel. *Montejo*, 556 U.S. at 786. This waiver was not connected to a waiver of his *Miranda* rights, as examined in *Montejo*, because he was not in custody and was not formally read his *Miranda* rights, as a result. But the waiver was nevertheless voluntary and effective. When Agent Saxey asked him if he wanted to stop in the first interview when he told the agents that he was represented and he decided to continue, he

waived any Sixth Amendment right to counsel that might have attached in this noncustodial, pre-indictment interview. In the second interview, when he was told he could stop at any time and consult an attorney, and he did not do so but voluntarily pressed forward with the interview anyway, he waived any Sixth Amendment right to counsel that might have attached by that time. It should not be overlooked that Defendant is a sophisticated individual with extensive experience in business and previous dealings with the authorities. His voluntary decision to continue with the noncustodial interviews was knowing and intelligent.

### 3. *Rule 4.2 of the Utah Rules of Professional Conduct*

The Government violated Rule 4.2(a) of Utah's Rules of Professional Conduct when it contacted and interviewed Defendant knowing him to be represented by counsel without first obtaining his counsel's consent or court approval.[1] Rule 4.2(a) provides that

> [i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. Notwithstanding the foregoing, an attorney may, without such prior consent, communicate with another's client if authorized to do so by any law, rule, or court order, in which event the communication shall be strictly restricted to that allowed by the law, rule or court order, or as authorized by paragraphs (b), (c), (d), or (3) of this Rule.

Rule 4.2(a) Utah R. Prof. Conduct (2012). "A person is 'known' to be represented when the lawyer has actual knowledge of the representation. Knowledge is a question of fact to be resolved by reference to the totality of the circumstances, including reference to any written

---

[1] The court also finds that the Government violated Rule 4.2(e)(1), which provides that "[w]hen communicating with a represented person pursuant to this Rule, no lawyer may inquire about privileged communications between the person and counsel or about information regarding litigation strategy or legal arguments of counsel or seek to induce the person to forgo representation or disregard the advice of the person's counsel." As instructed by the prosecutors, the agents asked Defendant during the second interview whether he would be willing to waive privilege and whether he intended to rely on an "advice of counsel" defense at trial, both prohibited inquiries under Rule 4.2(e)(1). However, Rule 4.2(e)(1) is not relevant for the due process analysis that follows and therefore will not be addressed further except that the court admonishes prosecutors in the U.S. Attorney's Office to adhere with exactness to the ethical obligations set forth in the Rules of Professional Conduct.

notice of the representation." *Id.* cmt [21]. And, importantly, "[a] person's knowledge may be inferred from circumstances." Rule 1.0(g) Utah R. Prof. Conduct. The rule applies to prosecutors practicing before the District Court for the District of Utah. DUCivR 83-1.1(g); DUCivR 83-1.5.1(a).[2] Moreover, violation of the ethical rules, including the no-contact rule provided in Rule 4.2(a), constitutes a violation of federal statute as well pursuant to the Citizens Protection Act of 1999, codified at 28 U.S.C. § 530B (the "Protection Act"), also known as the "McDade Amendment."[3] This federal statutory violation is significant for the due process analysis in Section II.C.4 below.

As a preliminary matter, the Government argues that Comment [14] shelters it from the Rule's prohibition. (*See, e.g.*, Pl.'s Resp. to Def.'s Suppl. Mot. Supp. 75-76 [Dkt. No. 320].) Comment [14] provides, in relevant part, that "[n]othing in this Rule, however, prevents law enforcement officers, even if acting under the general supervision of a government lawyer, from questioning a represented person. The actions of the officers will not be imputed to the government lawyer unless the conversation has been 'scripted' by the government lawyer." Rule 4.2 Utah R. Civ. P. cmt. [14]. The court agrees that this would be the Government's strongest grounds under the circumstances and facts in this case to avoid a violation of Rule 4.2. Comment [14] effectively ties in to the "alter ego" analysis—in certain circumstances "enforcement officials are agents of the prosecuting party." *United States v. Thomas*, 474 F.2d 110, 112 (10th

---

[2] The Government agrees that "its prosecutors, and the agents working as alter egos of the prosecutors, are subject to the state ethical rules in which the prosecutor is admitted to practice, as well as the local rules of the federal district court." (Pl.'s Resp. to Def.'s Suppl. Mot. Supp. 70 [Dkt. No. 320].) But it does not explain its view of what the consequences for violation of these rules should be.
[3] The Protection Act provides, in pertinent part, that "an attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). It was enacted as a response to a DOJ effort in the 1990s (put forward in the "Thornburgh Memorandum" and the "Reno Rules") to excuse federal attorneys from compliance with some aspects of state ethics rules.

Cir. 1973); *United States v. Ryans*, 903 F.2d 731, 735 (10th Cir. 1990) ("The parties do not dispute the applicability of [the no-contact rule] to criminal cases, to public prosecutors, or to their agents, when they act as the 'alter ego' of prosecuting attorneys."); *cf. United States v. Hammad*, 858 F.2d 834, 840 (2d. Cir. 1988) (holding that "artfully contrived lawyer's devices" can "shift the relationship between prosecutor and informant" so that the "informant becomes the prosecutor's alter ego and engages in communication proscribed by" the no-contact rule.).

Here, the prosecutors discussed their desire and intention with the investigative agents to contact and interview Defendant but told them to wait until they gave further instruction to proceed with such *ex parte* contact. The agents understood that the prosecutors were looking into whether they would be able to make such contact. Eventually, the prosecutors told the agents to proceed with making such contact, and the agents' trust in the prosecutors was so complete that even when Defendant strenuously maintained that he was represented by multiple counsel in the first interview, the agents continued with the interview (with Defendant's consent) and did nothing to pause and confirm Defendant's claim that he was in fact represented. They did not stop to confirm Defendant's assertion independently, explained Agent Saxey, because he was "completely certain" that Defendant was not represented, contrary to Defendant's own spontaneous and sincere protestation during the interview, because "I trusted Mr. Walz and the prosecutors I was working with." (Tr. Ev. Hrg. 11/08/12, at 97:3-7 [Dkt. No. 301].) The agents informed prosecutors after the first interview that Defendant had maintained he was represented, and prosecutors still authorized the second interview, instructing the agents to speak with Defendant again and providing them with at least half a dozen questions they should pose to him, at least two of which dealing with attorney-client privilege and whether he intended to rely on an "advice of counsel" defense at trial (though he was as yet unindicted). The court finds that given

the totality of the circumstances under the unique facts of this case, the agents were acting as alter egos of the prosecutors when they interviewed Defendant in February 2009 and that their actions will be "imputed to the government lawyer[s]." Rule 4.2 Utah R. Civ. P. cmt. [14]. Comment [14] does not provide the Government cover for how it proceeded in this case. [4]

The court has already expressed its finding that the Government knew Defendant was represented in the matter when prosecutors instructed the agents to contact and arrange the interviews. The Government, however, argues that even if it knew of Defendant's representation, its *ex parte* contact and interviews of Defendant were within the "authorized by law" exception contained in the Rule, which provides that "an attorney may, without such prior consent, communicate with another's client if authorized to do so by any law, rule, or court order, in which event the communication shall be strictly restricted to that allowed by the law, rule or court order, or as authorized by paragraphs (b), (c), (d), or (e) of this Rule." Rule 4.2(a) Utah R.

---

[4] The second interview was sufficiently scripted to obviate any protection available under Comment [14]—the Comment neither states nor implies that the interview would need to proceed based on a word for word script. Moreover, the nature of the questions prosecutors asked the agents to pose is of particular concern to the court. The court finds as a matter of public policy (the nature of which is consistent with the contours of Rule 4.2(a) and Comment [14]) that inquiring into these matters of a represented person outside the presence of counsel "significantly weaken[s] the protection that a party has by being represented by counsel." (Tr. Hrg. 4/18/13, at 48:11-14 [Dkt. No. 324].) The court remains perplexed as to why the Government believes "it has the right to inquire into how a party intends to defend before the government has even . . . gone to the grand jury for an indictment." (*Id.* at 48:20-24.) As to the first interview, under the totality of the circumstances applicable here, the public policy behind the no-contact rule and Comment [14] demands that "[t]he actions of the officers" be "imputed to the government lawyer[s]" as well because the agents specifically waited on the prosecutors' express approval in order to interview him outside the presence of his counsel. The December 2008 email from Ms. Korb to Ms. Stevens illustrates this intention and reveals the extent of the Government's actual knowledge about his representation, and its efforts to circumvent this representation in the interest of conducting the interview. (Email from J. Korb to E. Stevens, admitted as Gov. Ex. 6 at 11/8/12 Ev. Hrg.) The court dismisses any contention that the claim in the email that the Government merely wanted to interview Defendant about "a burglary of a home, in which 25-30 boxes of FranklinSquire documents were stolen" accurately reflects the Government's intention in coordinating between DOJ ethics advisors and the agents to authorize these interviews. (*Id.*) This posture is sufficient to cause the agents' actions in pursuing that interview, even after Defendant rejected the notion that he was not represented near the beginning of that interview, to be imputed to the prosecutors. Though this is admittedly a close case, as to the first interview, Comment [14] does not restrict the court's ability to remedy the injury caused to the protections that Rule 4.2 is intended to provide in a manner consistent with the logic and public policy motivating the Rule.

Prof. Conduct.[5] Citing to *United States v. Ryans*, 903 F.2d 731 (10th Cir. 1990) and its progeny, the Government contends that "pre-indictment, non-custodial contacts by the government are within the 'authorized by law' language of Rule 4.2." (Pl.'s Resp. to Def.'s Suppl. Auth. & Brief'g. at 9 [Dkt. No. 338].) The Government's summary, however, omits "covert" or "undercover" as a qualifier in describing the *ex parte* contacts that are within the 'authorized by law' exception as expressed in *Ryans*.

In *Ryans* the Tenth Circuit reversed the District Court's suppression of two taped pre-indictment, noncustodial conversations between the defendant and an *undercover* informant working for investigators, holding that the operative no-contact rule at the time, DR 7-104(A)(1) of the Model Code of Professional Responsibility,[6] did not justify suppression under those circumstances. The *Ryans* Court explained that the no-contact rule "was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel." *Id.* at 739. Thus, the Court held, the no-contact rule's "proscriptions do not attach during the investigative process before the initiation of criminal proceedings. On these facts, we hold that

---

[5] None of the exceptions under (b), (c), (d), or (e) apply, though the Government tries to invoke Rule 4.2(c)(1) in its favor, leaning on the inherent ambiguity in the meaning of "matter" as used in Rule 4.2(a) and 4.2(c)(1). Rule 4.2(c)(1) allows a "government lawyer" or a "person acting under the lawyer's direction in the matter" to communicate with a represented person if "the communication is in the course of, and limited to, an investigation of a difference [sic] matter unrelated to the representation or any ongoing, unlawful conduct." (*See, e.g.*, Pl.'s Resp. to Def.'s Suppl. Mot. Supp. 75-76 [Dkt. No. 320].) Ms. Korb, FBI Agent Saxey, and IRS Agent Marker have all testified that the current charges against Defendant stem from the initial state investigation as carried over to the federal investigation in February 2008. However, the fundamental continuity of this matter with the earlier state investigation, on which Mr. Marker was also investigating the tax angle as well, is actually irrelevant. The court finds that the substance of the February 2009 interviews related to the same matter on which both the prosecutors and agents had been aware since March 2008, at the latest, that Defendant was represented by at least Mr. Wheeler. The testimony and evidence both support the inference that all were also aware that Defendant was represented by Mr. Skousen during this period on this matter as well. The agents, in particular, had actual knowledge of this given Agent Marker's interactions with Mr. Skousen since the March 2007 meeting.

[6] "During the course of his representation of a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

the adversarial process had not yet begun." *Id.* at 740. And, clarifying, the Tenth Circuit observed that the purpose of the no-contact rule "is to prohibit *all* communications between an attorney and a represented party, but after initiation of adversary proceedings." *Id.* at 741 (emphasis in original). In other words, under *Ryans*, even undercover or covert communication with a represented party—which, importantly, was the relevant factual basis for the holding in *Ryans*, i.e. the use of an undercover informant to contact and obtain information from a represented person before the indictment—would violate the no-contact rule if it occurred once an "adversarial relationship between litigants" had emerged. *See id.* at 739.

The Government's citation to and reliance on *Ryans* to justify its approach in instructing the agents to contact Defendant outside the presence of his known counsel is misplaced. First, despite broad language in the Court's analysis, *Ryans* (and its progeny, including in other jurisdictions) related to *covert* investigation techniques in the noncustodial, pre-indictment investigation of a represented target. In supplemental briefing, the Government did not provide any cases in which undercover or covert police operations did not similarly define the analysis. *Ryans* is therefore straightforwardly distinguishable on that basis alone, given that, in this case, the Government initiated overt communications with Defendant rather than pursuing the investigation through use of an undercover informant as in *Ryans* or through other covert means.[7] Second, notwithstanding the Government's arguments to the contrary, the

---

[7] In one of the few cases to venture outside the confines of considering covert or undercover contacts, the Ninth Circuit expressed a view that California's no-contact rule, which was similar to DR 7-104(A)(1) of the Model Code of Professional Responsibility, would govern an *overt* "pre-indictment, non-custodial communications" with a represented person under circumstances "involving fully defined adversarial roles, impending grand jury proceedings, and awareness on the part of the responsible government actors of [the target's] ongoing legal representation." *United States v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000) (holding, however, that the rule did not prohibit the contact in question where an employee of a represented part had initiated the *ex parte* contact with the government attorney "for the purpose of disclosing that corporate officers are attempting to suborn perjury and obstruct justice" because the purpose of the rule is not to enable the subornation of perjury).

"person"/"party" distinction between the no-contact rule at issue in *Ryans* (relating to a "party") and Utah's current Rule 4.2(a) (relating to a "person") is dispositive for the analysis under the facts of this case. (*See* Pl.'s Resp. to Def.'s Suppl. Mot. Supp. at 76-79 [Dkt. No. 320].)

It is true that *Ryans* links the applicability of the version of the no-contact rule at issue there to the timing of the attachment of the Sixth Amendment right to counsel. *Ryans*, 903 F.2d at 739. But the court finds that the 2005 revisions to the language of Utah's Rule 4.2 must necessarily sever this link. Citing the Sixth Amendment analysis controlling in *United States v. Gouveia*, 467 U.S. 180, 189 (1984), the Tenth Circuit emphasized the initiation of adversary proceedings as the trigger for application of the no-contact rule applicable in *Ryans* as well. *Ryans*, 903 F.2d at 739 (citing *Gouveia* for the principle that the "Sixth Amendment right to counsel attaches only where the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or both."). Tellingly, this conclusion turned specifically on the *Ryans* Court' s analysis of the word "party" rather than "person" in the no-contact rule applicable in that case: "In contrast to DR 7-104(A)(2), which prohibits a lawyer representing a client from giving advice to a 'person' who is not represented by counsel, DR 1-704(A)(1) [the no-contact rule] prohibits communications with a 'party.'" *Id.* Pressing on with this formalistic, syntactical analysis, the Tenth Circuit referred to the definition of "party" in Black's Law Dictionary to support the premise that the no-contact rule's use of the word "party" rather than "person" (as compared to the very next provision of the same rule) was intended to narrow the scope of the no-contact rule to apply only once formal adversarial proceedings have been initiated against or involving the represented person. *Id.* Therefore, the Tenth Circuit in *Ryans* established that,

based on the no-contact rule's use of the word "party" rather than "person," the applicability of the rule was essentially co-extensive with the Sixth Amendment right to counsel. *Id.*[8]

The court agrees with *Ryans* that the difference between use of "party" and "person" in the language of the no-contact rule is meaningful.[9] In 2005, Utah broadened the language of its own Rule 4.2, which at the time it replaced Utah's DR 7-104(A)(1)—a provision identical to the one at issue in *Ryans*—in 1988 prohibited *ex parte* communications with a "party" known to be represented by counsel, rather than a "person" known to be represented as in its current wording. This change appears to have given effect to an intention in Utah that the rule should apply regardless of whether formal legal proceedings have been commenced. That is, even before the Utah Supreme Court approved this change in 2005, the Utah State Bar Ethics Advisory Opinion Committee had issued an opinion on January 26, 1996 directly analyzing the scope of the term "party" in the then current version of the rule and addressing the question of when a government lawyer could make *ex parte* contact with persons known to be represented by counsel. Utah State

---

[8] *See also United States v. Sutton*, 801 F.2d 1346 (D.C. Cir. 1986); *United States v. Dodds*, 711 F.2d 84 (8th Cir. 1983); *United States v. Fitterer*, 710 F.2d 1328 (8th Cir. 1983); *United States v. Kenny*, 645 F.2d 1323 (9th Cir. 1981); *United States v. Lemonakis*, 485 F.2d 941 (D.C. Cir. 1974).

[9] Other courts have likewise found the distinction to be dispositive. The Third Circuit, for example, analyzed New Jersey's no-contact rule—which used the term "party" rather than "person"—on this very basis in considering the admissibility of covertly recorded conversations with defendants in pre-indictment interactions with an informant: "By its terms, Rule 4.2 applies to a 'party' represented in a 'matter.' A 'party' is necessarily a 'party' to something." *United States v. Balter*, 91 F.3d 427,436 (3d Cir. 1996). Looking to state court interpretation of the ethics rule (an appropriate approach to seek interpretive guidance of a state's ethics rules), the *Balter* Court noted that "[t]he Appellate Division of the New Jersey Superior Court has held that a criminal suspect is not a 'party' until 'after formal legal or adversarial proceedings are commenced.'" *Id.* (quoting *State of New Jersey v. Ciba-Geigy Corp.*, 589 A.2d 180, 183 (N.J. App. 1991)). With respect to the pre-indictment use of an undercover informant to secretly record incriminating statements made by the defendants, the *Balter* Court held, therefore, that "New Jersey Rule 4.2 is inapplicable to [such covert] contacts made by prosecutors or their agents with criminal suspects in the course of a pre-indictment investigation" and noted that "with the exception of the Second Circuit, every court of appeals that has considered *a similar case* has held, *for substantially the same reasons* as those noted above, that rules such as New Jersey Rule 4.2 do not apply to pre-indictment criminal investigations by government attorneys." (*Id.*) (emphasis added, "similar case" referring to pre-indictment, covert or undercover *ex parte* contact, and the "same reasons" referring in part to the "party"/"person" distinction as well as the policy concern addressed below in footnote 13 and the accompanying text).

Bar Ethics Advisory Op., 95-05 (Jan. 26, 1996).[10] Acknowledging the analysis in *Ryans*, where linking the Oklahoma rule's applicability to the attachment of the Sixth Amendment right to counsel turned on the use of the word "party" instead of "person," *id* at nn. 6-7, the Ethics Advisory Opinion Committee nevertheless opined that

> The word 'party' in Rule 4.2 of the Utah Rules of Professional Conduct means a 'party to a matter' for which legal representation has been obtained, not the more limited 'party to a legal proceeding.' Subject to the exceptions stated in the rule, Rule 4.2 intends to restrict unauthorized ex parte contacts with any person who is represented by counsel concerning the matter in question, whether or not the person is a party to a formal legal proceeding.

In fact, the opinion provided valuable interpretive guidance by clarifying that "Rule 4.2 restrictions are intended to apply to 'represented persons'" as well (though at the time the Utah rule used the word "party"). Thus, "a prosecutor would violate the Utah Rules of Professional Conduct if he made an *ex parte* contact, or caused another to make an *ex parte* contact, with a person the prosecutor knew was represented by counsel in the matter being investigated unless the prosecutor obtained the consent of that person's lawyer." *Id.*

As the Government has argued, the Ethics Advisory Opinion is not binding or authoritative for the court's analysis. (Pl.'s Resp. to Def.'s Mot. Supp. 18 n.10 [Dkt. No. 281].) Rather, the opinion's significance lies in the insight it gives into the intent of Rule 4.2 in Utah, particularly after the Utah Supreme Court approved the 2005 wording changes, including changing "party" to "person." The Ethics Advisory Committee had already noted in the 1996 opinion that "in partial response to this confusion over 'party' v. 'person,' the American Bar Association has recently amended Model Rule 4.2 to change the term 'party' to 'person.'" *Id.* And in 2005, the Utah rule was also changed accordingly, in keeping with the interpretive framework described in the 1996 opinion and recognized by the ABA. Because the Utah Rule

---

[10] http://utahbar.org/rules_ops_pols/ethics_opinions/op_95_05.html (last accessed Aug. 9, 2013).

refers to a "person" rather than a "party," the link forged by the *Ryans* Court between the applicability of the no-contact rule and the attachment of the Sixth Amendment right to counsel has come undone in Utah.

The Tenth Circuit's passing reference to *Ryans* in the more recent case *United States v. Mullins*, 613 F.3d 1273 (10th Cir. 2010) does not rehabilitate this approach, as the Government suggests. *Mullins*, once again, concerned the use of an undercover informant in obtaining statements from a target of an investigation. It is inapposite on that basis alone. In addition, however, the Tenth Circuit was confronted with a version of the no-contact rule from Colorado that retained the word "party" instead of "person" as in *Ryans*, thus providing the Court with no basis to consider this important distinguishing factor from *Ryans*. *Id.* at 1288-89. As a result, the *Mullins* Court predictably followed *Ryans* with virtually no analysis, stating simply that "Rule 4.2 applies, like the Sixth Amendment, only once adversary criminal proceedings have commenced." *Id.* at 1289. But this conclusion is untenable here, where both the nature of the *ex parte* contact (overt vs. covert communications during investigation) and the language of the no-contact rule ("person" instead of "party," expressly rendering the non-contact rule applicable regardless of whether "whether or not the person is a party to a formal legal proceeding") are facially distinguishable. *Mullins*, therefore, is not controlling.

The court finds therefore that the current Utah Rule 4.2(a) applies more broadly than the Oklahoma rule under consideration in *Ryans* and prohibits overt *ex parte* communications with any person known to be represented in the matter "whether or not the person is a party to a formal legal proceeding." The syntax demands this and the intention in Utah is clear from the background discussed above. Of course, the Rule still contains the "authorized by law" exception, which itself was also strengthened in 2005, now reading in full, "an attorney may,

without such prior consent, communicate with another's client if authorized to do so by any law, rule, or court order." Rule 4.2(a) Utah R. Prof. Conduct. And the court finds that this exception still has the teeth provided to it by the specific holding in *Ryans* (and *Mullins*); that is, that *covert* or *undercover* noncustodial, pre-indictment *ex parte* contact by law enforcement personnel in the investigative phase of a matter is "authorized by law" for purposes the no-contact rule.[11] That has become a "well-established investigatory technique" that is authorized by law on the weight of *Ryans* and extensive progeny in many jurisdictions. *See, e.g.*, *United States v. Brown*, 595 F.3d 498, 516 (3d Cir. 2010) (evaluating the "well-established investigatory technique" of covert noncustodial, pre-indictment *ex parte* contact and holding that the McDade Amendment does not prohibit such a technique simply because a court in a given jurisdiction has not been expressly authorized the technique—"[a]fter all, the Pennsylvania courts have *not* held that such conduct [pre-indictment use of undercover informant to make *ex parte* contact] is impermissible"). But the "well-established investigatory technique" of making noncustodial, pre-indictment covert or undercover contact (such as through an informant) with a target known to be represented is not at issue here. The court does not accept that it is a "well-established investigatory technique" for the IRS and FBI to jointly interview a target known to be represented by counsel at the instruction of prosecutors who have previously attempted to subpoena the target to testify before a grand jury as the documents custodian for his companies (and were rebuffed by his counsel on the matter in the attempt). To the contrary, the court finds that this technique is off limits, both

---

[11] This is why the Government also finds no support in its resort to *United States v. Isch*, No.: CR-09-040-D, 2009 U.S. Dist. LEXIS 67264 (W.D. Okl. Aug. 3, 2009) for its theory that the 2005 change in wording from "party" to "person" in Utah's Rule 4.2 had no effect on the scope of the Rule's protection. (*See* Pl.'s Resp. to Def.'s Suppl. Mot. Supp. 78-79 [Dkt. No. 320].) *Isch*, like *Ryans*, involved covert investigatory techniques—the supervisor of a prison guard under investigation for assault and battery secretly recorded discussions with him as an agent for the Government, though defendant was represented by counsel. As noted, this court's discussion and ruling does not disrupt the continued viability of covert *ex parte* contact with a represented target as an investigative technique, as established by *Ryans*.

by operation of Utah's no-contact rule and as a result of the internal policies of all the agencies/offices involved in the investigation and prosecution of Defendant, as discussed in Part II.C.4 below.[12]

Finding, as it must, that Rule 4.2(a) applies under the circumstances of this case to prohibit overt government contact with Defendant as a person known to them to be represented by counsel in the matter under investigation, does not, the court stresses, implicate the policy concerns expressed by other courts in evaluating the application of no-contact rules. Courts considering the Government's actions in light of various no-contact rules have virtually uniformly, since at least *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), considered and weighed the Government's legitimate interest in law enforcement and investigating crimes against the danger that through such *ex parte* contact, a target might be "tricked into giving his case away by opposing counsel's artfully crafted questions." *Ryans*, 903 F.2d at 739 (quoting *United States v. Jamil*, 707 F.2d 638, 645 (2d Cir. 1983)). This court's ruling does not in any way upset the "legitimate investigative techniques"—including "the use of informants to gather evidence against a suspect"—that prosecutors are expressly "authorized by law to employ" in conducting and supervising criminal investigations. *Hammad*, 858 F.2d at 839. And what of "career criminals with permanent 'in house' counsel"—would they be able to "immunize

---

[12] The court observes that abundant testimony and evidence establish the prosecutors and agents' understanding that such overt contact would not be a "well-established investigatory technique" that would thus fall under the "authorized by law" exception to the no-contact rule. AUSA Walz explained that it was his "practice" to work through counsel of represented targets: in the U.S. Attorney's Office "when we know someone is represented . . . our practice, at least in white collar matters . . . [is] not to go to a target or even a witness without going through the attorney." (Tr. Ev. Hrg. 11/08/12, at 196:15-197:2 [Dkt. No. 301].) This understanding is so entrenched that Agent Saxey even expressed it to Defendant in the first interview, which is what prompted Defendant to object to the assertion that he was unrepresented: "Rick you were represented for a while, and we're not permitted to talk to you [outside of the presence of counsel if you are represented] . . . ." (Tr. Int. 2/13/09, at 38.) The court agrees with these individuals' understanding that, rather than being authorized by law, it is a "well-established investigatory technique" *not* to initiate overt contact as to the matter under investigation with represented targets, or even witnesses, in these investigations.

themselves from infiltration by informants"? *Id.*[13] The Second Circuit in *Hammad* expressed that they "share this concern and would not interpret the [no-contact] rule as precluding undercover investigations." *Id.* This court's ruling is consistent with both *Hammad* and *Ryans* on this point—it does nothing to upset "legitimate investigative techniques" such as the pre-indictment use of undercover informants. The broadening effect of the court's ruling arises merely from the court's recognition that, after 2005, the timing of the applicability of the no-contact rule in Utah can no longer be pegged to the attachment of the Sixth Amendment right to counsel. The latter may require the initiation of adversarial judicial proceedings in some manner; the former can no longer be analyzed on that basis in Utah, lest the change in wording from "party" to "person" and the express intent behind the Utah rule be rendered meaningless.[14]

Finally, the Sixth Amendment analysis is not coextensive with the no-contact rule analysis in another significant way. Athough the court found above that Defendant had voluntarily waived his Sixth Amendment right to counsel, the Tenth Circuit has long held that a represented person cannot, on his or her own, consent to speak with an attorney from the other side. In *United States v. Thomas*, 474 F.2d 110 (10th Cir. 1973), the Tenth Circuit considered New Mexico's no-contact rule in the context of a custodial, pre-indictment interview between a

---

[13] Echoing this concern raised by the Government in *Hammad*, the Government in this case has warned that the somewhat broader interpretation of Rule 4.2 that the court now finds required by the Rule's own language and interpretive history "would allow those with financial means to retain counsel for any purpose, which does not appear to be the intention of the rule, and which would allow these individuals to insulate them from law enforcement—a result the courts have scorned as being unfair to impoverished and disadvantaged criminal defendants." (Pl.'s Resp. to Def.'s Suppl. Auth. & Brief. 9 n.4 [Dkt. No. 338].) The court disagrees. This is not the case here. Defendant was legitimately represented by counsel, as known by the Government, throughout the entire course of this investigation. Moreover, the pre-indictment use of informants or undercover techniques remains, as ever, authorized by law in connection with targets of investigations. The court's ruling has no effect on the *Ryans* rule allowing covert noncustodial, pre-indictment *ex parte* communications with represented suspects.

[14] As noted several times already, undercover or overt contact with represented individuals remains a "well-established investigatory technique" and as such is "authorized by law" under *Ryans* and *Mullins*; more nuance, however, is required in parsing *Ryans* after the 2005 changes to Utah's no-contact rule and in consideration of the unique facts of this case, where overt *ex parte* contact is at issue.

represented suspect/target (against whom a criminal complaint had been filed) and a federal agent investigating him in the matter. The Tenth Circuit explained that "[t]he canons of ethics governing the actions of attorneys in all United States Courts in this circuit prohibit an attorney from communicating about the controversy with a party on the other side of the case who is represented by an attorney." *Id.* at 111. The *Thomas* Court stated that "it is improper to so communicate even if the party agrees to be interviewed without his attorney being present." *Id.* Thus, the Tenth Circuit held that

> once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the canon of ethics. This is obviously not something which the defendant alone can waive.

*Id.* at 112. This paramount holding—that the prohibition of the no-contact rule is "not something which the defendant alone can waive"—is reflected in one of the comments to the Rule: "This Rule applies even though the represented person initiates or consents to the communication." Rule 4.2 Utah R. Prof. Conduct, cmt. [4].

The significance of the court's ruling—that Utah Rule 4.2(a) prohibits overt *ex parte* communications with any person known to be represented whether or not the person is a party to a formal legal proceeding, unless, of course, authorized "by any law, rule, or court order"—is its implications for Defendant's Fifth Amendment due process guarantee discussed below.

### 4. Due Process

The Government's Rule 4.2 violation denied Defendant due process under the Fifth Amendment. A formidable body of precedent, though not without substantial wrinkles, establishes that the Government's failure to comply with its own internal agency policies can

constitute a denial of due process if those policies are publicly known and intended to protect citizens' constitutional rights. Much of this precedent cites to, or stems from, *Accardi v. Shaughnessy*, a deportation case in which the Board of Immigration and the DOJ failed to follow their own established procedures and therefore effectively denied due process to the petitioner. 347 U.S. 260, 268 (1954), superseded on other grounds, as stated in *LaGuerre v. Reno*, 164 F.3d 1035 (7th Cir. 1998) (changes to the applicable statutory procedures). But in an even older case laying the foundation for this rule, *Bridges v. Wixon*, the Supreme Court held that "one under investigation . . . is legally entitled to insist upon the observance of rules" promulgated by an executive or legislative body for his protection. 326 U.S. 135, 153 (1945).[15]

a.       The *Accardi Rule and Its Progeny*

Perhaps the most succinct articulation of this principle was formulated by the dissenting opinion in *United States v. Thompson*, 579 F.2d 1184 (10th Cir. 1978), though developments in this area of law during intervening decades, particularly *United States v. Caceres* (discussed below), have arguably narrowed and added nuance to the application of this rule. The *Thompson* majority had found that the internal policy at issue—the DOJ's *Petite* policy requiring involvement of the Attorney General in the authorization process for dual state-federal prosecutions with double jeopardy implications—had not been violated simply because the required recommendation and authorization had been delayed. *Id.* at 1188-89. Also, the *Thompson* Court effectively described the policy as an internal measure ensuring orderly administration consistent with federalism concerns and not a policy giving rise to or protecting rights because such double jeopardy scenarios are a function of the dual-sovereignty inherent in the federal system. *Id.* at 1188. Disagreeing, the dissent first argued in favor of the policy's

---

[15] Even *United States v. Caceres*, a case understood to narrow the rule followed by the *Accardi* progeny, affirms this principle from *Bridges*, as discussed in more detail below. 440 U.S. 741, 749 (1979).

rights-protecting nature, then situated the policy within the due process jurisprudence relevant here: "It would not seem necessary to discuss at length the cases which require an agency to adhere to the policy and regulations it promulgates. The cases are especially clear in the Internal Revenue Service rule problems." *Id.* at 1191 (citing *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969) and *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970)). Setting aside the dissent's alternative substantive view about the *Petite* policy, its explanation of the *Accardi* rule is instructive for the present case:

> From the variety of situations in which the courts have held that agencies must follow their statements of policy and directives, it is apparent that if the statements are applicable, are made known, and are of guidance for the execution of the agency policies, it makes no difference what they are called nor how they are adopted. The public has a right to rely on them as against some inconsistent case by case subjective determination by a public official. The cases further demonstrate that it makes no difference whether the agency has express statutory authority to adopt the policy. The agency has to run its business, it has to function. This is done by regulations and policy statements, and it makes no difference whether Congress has expressly directed them or not if they are within the general objectives of the agency, and especially if they represent some self-restraint on its authority or discretion as in the case before us.

*Id.* Without thereby joining the *Thompson* dissent in its substantive disagreement with the majority's holding in *Thompson*, the court looks to this statement by the dissent as an accurate, useful distillation of the contours of this area of law.

The *Thompson* dissent appropriately cites *Heffner* and *Leahy* as primary examples of the application of this rule of law. In *Heffner*, the defendant appeared voluntarily at the local IRS office for two interviews (nine months apart) about excess tax exemptions he had intentionally wrongfully claimed in an attempt to get the government's attention in the mistaken belief that it would then intervene in a private dispute about the loss of certain business and residential property. 420 F.2d 809, 810 (4th Cir. 1969). The agents who interviewed him did not provide the then-current version of the *Miranda*-like noncustodial statement of rights (which then, as now,

included a statement that he could retain counsel to assist him in the interviews) in either interview, though reading this statement was prescribed by recently issued internal IRS policy in the "IRS News Release No. 897, Oct. 3, 1967." *Id.* at 811. The IRS News Release stated that "the purpose of the instruction was to 'insure uniformity' in protecting all persons from unknowledgeable relinquishment of their rights." *Id.* at 813.

Citing to *Accardi*, the *Heffner* Court held that "[a]n agency of the federal government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." *Id.* at 811 (citing other cases applying the *Accardi* rule). The Fourth Circuit explained that "[i]t is of no significance that the procedures or instructions which the IRS has established are more generous than the Constitution requires." *Id.* at 812. "Nor does it matter that these IRS instructions to Special Agents were not promulgated in something formally labeled a 'Regulation' or adopted with strict regard to the Administrative Procedure Act; the *Accardi* doctrine has a broader sweep." *Id.* (citing cases in which the rule applied to an Army bulletin, an FCC rule, and a Department of Defense directive). The cases applying the *Accardi* rule to various agency policies, directives, and rules, noted the *Heffner* Court, "are consistent with the doctrine's policy to prevent the arbitrariness which is inherently characteristic of an agency's violation of its own procedures." *Id.* And the *Heffner* Court identified a salutary effect of applying the *Accardi* rule to the internal IRS policy—a salutary effect that applies equally in the present case. Reversing the district court's decision to admit the agents' testimony concerning the defendant's incriminating statements "would not only have the salutary effects of encouraging IRS agents to observe their own procedures, . . . but would assist the IRS in fulfilling its own important stated purpose in requiring that the warnings be given." *Id.* at 813 (internal citation omitted). And it is possible that "defendant, alerted to the

prosecutorial purpose of the interview, would have requested counsel." *Id.* The sound reasoning

evident in *Heffner*'s application of the *Accardi* rule provided occasion for further explanation in

*Leahy*.

The First Circuit in *Leahy* followed *Heffner* in applying the *Accardi* rule, again to a

situation in which IRS agents did not follow internal IRS procedure in giving certain warnings

upon initial contact with targets of their investigation. 434 F.2d 7 (1st Cir. 1970). "Relying on the

general principle that due process requires government agencies to follow their specified

procedures and on [*Heffner*]," the district court granted the defendant's motion to suppress and

the First Circuit affirmed. *Id.* at 7 & 11. The *Leahy* Court first clarified that *Miranda* on its own

would not be held to apply to IRS investigations in addition to police investigations. *Id.* at 8. But

in establishing the internal policy described in *Heffner*, the IRS had taken the initiative on its

own to comply with the Supreme Court's request in *Miranda* to find "increasingly effective ways

of protecting the rights of the individual while promoting efficient enforcement of our criminal

laws." *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).

Despite the stated rights-protecting purpose of the IRS procedures (as also explained in

*Heffner*), in *Leahy* the Government argued that *Heffner* should be distinguished, primarily

because it cited cases mostly arising from adjudicatory proceedings, but also because "agencies

have no power to impose exclusionary rules on the courts; and that excluding admissions secured

in violation of the I.R.S. announced procedure will result in 'endless motions to suppress.'" *Id.* at

9. But the Court dismissed the "adjudicatory-investigatory dichotomy" as "talismanic only in the

context of an agency hearing." *Id.* It is true, accepted the *Leahy* Court, that "when a government

agency [is] engaged in legislative-like fact-finding, persons affected [are] not entitled to the same

due process rights which would have been available had the agency been engaged in

adjudication." *Id.* at 9 n.5 (discussing *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970)). But "[h]ere we are faced with the question of the limits which due process imposes on a police agency in the course of a criminal investigation. There can be no doubt that such investigations are subject to due process." *Id.*

The *Leahy* Court agreed with the Government's contention that "agencies have no power to impose exclusionary rules on the courts" but dismissed it as specious with reference to the facts at issue. "In form the I.R.S. announced procedure has nothing to do with admissibility. The decision as to the exclusionary implications of a violation of the procedure is ours, and based on our sense of the duties and rights so created." *Id.* at 10. In light of this consideration, "[t]he crucial question is whether we must exclude this evidence so that agencies will be compelled to adhere to the standards of behavior that they have formally and purposely adopted in the light of the requirements of the Constitution, even though the standards may go somewhat further than the Constitution requires." *Id.* Far from spurring endless motions to suppress, as the Government argued, this would result in "a clear rule excluding admissions secured by an agent who has not conformed to required procedure" that "would be more likely to decrease, rather than increase, the number of such motions and hearings." *Id.* The rule would overcome a natural disincentive within agencies to monitor the conduct of their agents. *Id.* And, from a policy perspective, it would prevent the erosion of "citizens' faith in the even-handed administration of the laws." *Id.* Importantly, the First Circuit added that "[w]e do not say that agencies always violate due process when they fail to adhere to their procedures." *Id.* at 11. The key inquiry is whether such a deviation from agency procedure would "deprive the person interviewed of protection that was afforded to other taxpayers."[16]  Thus, the *Leahy* Court held "that the agency had a duty to

---

[16] And, relevant here, where the court has found a slight broadening of the applicability of Rule 4.2 to overt *ex parte* contacts in the course of an investigation but no change to the *Ryans* rule authorizing

conform to its procedure, that citizens have a right to rely on conformance, and that the courts must enforce both the right and the duty." *Id.*

The Tenth Circuit's approach to both *Heffner* and *Leahy* has also focused on an agency's creation of an internal duty protective of citizens' rights as a touchstone of the analysis, following the priority those Courts gave to this consideration in their analyses. For instance, in *United States v. Rosenburg*, the taxpayer appealed from the Tax Court's decision in a civil audit matter upholding the IRS Commissioner's determination of a tax deficiency. Citing to *Heffner* and *Leahy*, the taxpayer claimed she was "not afforded prelitigation administrative review" of the assessed tax liability despite procedures allowing her to appeal such a notice of deficiency to the Appellate Division of the IRS. 450 F.2d 529, 531 (10th Cir. 1971). The Tenth Circuit affirmed the Tax Court. *Id.* at 533.

"Both *Heffner* and *Leahy* are grounded on due process," explained the *Rosenburg* Court. *Id.* at 532. *Accardi*, it added, concerned an internal agency regulation that "was for the protection of the person sought to be deported." *Id.* Clarifying, the Court noted that "[i]n *Leahy* the Court did not say that 'agencies always violate due process when they fail to adhere to their procedures.'" *Id.* Rather, "[i]t pointed out that the procedures in question were designed to protect the constitutional rights of taxpayers and that 'our result would have been different if the IRS had violated a procedure designed to promote some other agency goal.'" *Id.* Following this guidance from *Leahy*, the *Rosenburg* Court held that the IRS procedures at issue "are not designed to protect the constitutional rights of the taxpayer but rather provide methods by which the Audit Division's determination can be checked without the expense and delay of litigation." *Id.* at 533. In other words, the procedure in *Rosenburg*, like that in *United States v. Lockyer*, 448

---

covert pre-indictment, noncustodial *ex parte* contact in the investigation, the *Leahy* Court acknowledged the continued legitimacy of undercover police work even in the face of this rule—"[n]o one has the right to commit a crime, even if misled by the government as to its enforcement methods." *Id.*

F.2d 417 (10th Cir. 1971),[17] "came within the internal administration exception noted in *Leahy*." *Id.* at 532.[18] "We believe that there was no denial of due process and that the case is distinguishable from the criminal prosecutions considered in *Heffner* and *Leahy*." *Id.* at 533.

      *b.*    *Narrowing* Accardi *in* Caceres *and Its Progeny*

      The most recent court to consider *Heffner* and *Leahy* questions their continued viability based on *United States v. Caceres*, 440 U.S. 741 (1979), though this does not persuade the court that the reasoning outlined above is no longer sound guidance in applying and clarifying the *Accardi* rule. In *United States v. Korn*, No.:11-cr-00384-WMS-JJM, 2013 U.S. Dist. LEXIS 83889 (W.D.N.Y. June 13, 2013), the defendant alleged a no-contact rule violation by an IRS and an FBI agent working together. In a civil investigation, the IRS officer had not provided the *Miranda*-like noncustodial statement of rights still required by internal IRS procedures. *Id.* at *4. The defendant argued that the interview "was a de facto criminal investigation since the elements of the [civil statute] under which [the IRS agent] was investigating the defendant 'are virtually

---

[17] In *Lockyer*, the Tenth Circuit reversed the District Court's suppression of evidence, holding that the procedure in question—an internal, unpublished directive in the Internal Revenue Service Audit Technique Handbook meant to guide IRS agents in their investigation, including steps to take in transferring a matter from a civil to a criminal investigation—"is a far cry from that present in *Accardi* and also from the directive considered in *Heffner* and *Leahy*. The entire design and thrust of the instant directive is that of internal administration. . . . Therefore, we must hold that the directive was not and is not available to the taxpayer here as a definition of his rights . . . ." *Id.* at 421. In any event, the Court noted its disagreement with the trial court that the agent had, in fact, violated the internal regulation in the first place. *Id.*

[18] The *Leahy* Court explained this "internal administrative exception" as follows:

    Thus, if I.R.S. procedures stated that only trained Special Agents were to interview suspects, an interrogation which complied with all other procedures but was conducted by an accountant, would not seem to us to conflict with due process. Such a deviation from I.R.S. procedures would not deprive the person interviewed of protection that was afforded to other taxpayers; his interview would not differ significantly from others except that his questioner would be less adept. Only the efficiency of I.R.S. operations would be harmed. Unlike the situation here, the agency would gain no advantage from the selective unenforcement of its procedures, and the agency would have no disincentive to discipline the transgressing employee.

*Leahy*, 434 F.2d at 11.

identical' to [the criminal statute] under which defendant was ultimately charged." *Id.* at *5. The section of the Internal Revenue Manual at issue in *Korn* cites to *Leahy* and *Heffner*, but the *Korn* Court expressed doubt as to "their continued validity" since they were decided prior to *United States v. Caceres*, 440 U.S. 741 (1979). *Id.* at *8 (citing *United States v. Irvine*, 699 F.2d 43, 46 (1st Cir. 1983) ("In light of *Caceres*, the approach taken by this court in *Leahy* and its successors is no longer good law.")).[19]

In *Caceres*, the defendant tried multiple times to bribe an IRS official in connection with an audit, and several of these conversations were monitored. 440 U.S. at 746. The defendant moved to exclude the recordings and testimony of monitoring agents because internal IRS authorization procedures for such monitoring had not been followed in all respects, resulting in a delayed authorization from the responsible Deputy Assistant Attorney General that came too late for two of the monitorings at issue. *Id.* at 748. "In this case . . . unlike *Bridges v. Wixon*, the agency was not required by the Constitution or by statute to adopt any particular procedures or rules before engaging in consensual monitoring and recording." *Id.* at 749-50. The Supreme Court therefore reversed the District Court and Ninth Circuit,[20] holding that "the violations of agency regulations disclosed by this record do not raise any constitutional questions." *Id.* at 751.[21] This was because the delayed authorization did not signal an equal protection issue since

---

[19] Ultimately the *Korn* court focused on the false equivalency of the civil and criminal IRS investigations to deny the defendant's request to expand the evidentiary hearing to explore the motion to suppress at that time, noting that the Government conceded that "the IRS may not develop a criminal investigation under the auspices of a civil audit" and applying the three-part test for suppression outlined in *United States v. Grunewald*, 987 F.2d 531 (8th Cir. 1993). *Korn*, 2013 U.S. Dist. LEXIS 83889, at *16.

[20] The District Court and Court of Appeals had both found that the two monitorings occurring before the authorization was given pursuant to IRS Manual procedures were obtained in violation of the internal IRS procedures and excluded them. *Caceres*, 440 U.S. at 743.

[21] In *Leahy*, by contrast, the First Circuit was considering IRS procedures that, although found in the same manual, were in fact "purposely adopted in the light of the requirements of the Constitution, even though the standards may go somewhat further than the Constitution requires." *Leahy*, 434 F.2d at 10. As the *Leahy* Court acknowledged, "[w]e do not say that agencies always violate due process when they fail to adhere to their procedures." *Id.* at 11. The inquiry is whether the purpose of the procedures

the record provided no indication, and no claim was made, that following the procedures would have resulted in the DOJ denying the monitoring request. *Id.* More importantly, due process was not implicated because the defendant could not claim that he had relied on the regulation "or that its breach had any effect on his conduct." *Id.* at 753.[22] In other words, "none of the respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations"; therefore, "our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case." *Id.* at 755. In such cases, the procedures or regulations do not tie back into due process or even equal protection considerations, and exclusion is not necessary.[23] The Supreme Court pragmatically noted "the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures." *Id.* at 755-56. It concluded that "it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form." *Id.* at 756.

---

was to protect rights or simply to guide agents in orderly administration. The procedures in *Leahy* were created to protect rights in the agency's independent effort to respect the principles underlying *Miranda*. The procedures at issue in *Caceres* were not similarly related to due process concerns. Thus, though both sets of procedures were found in the same IRS Manual, the two cases are distinguishable for that reason. On this basis, the court believes that the guidance in *Leahy* remains instructive, despite the First Circuit's comment in *Irvine* that *Leahy* perhaps might not being good law after *Caceres*. 699 F.2d at 46. This need not be the case since the two are distinguishable.

[22] "For the record makes it perfectly clear that a delay in processing the request, rather than any doubt about is propriety or sufficiency, was the sole reason why advance authorization was not obtained" before the first two monitorings. *Caceres*, 440 U.S. at 753.

[23] "It does not necessarily follow, however, as a matter of logic or law, that the agency ha[s] no duty to obey" such procedures or regulations that do not relate back to the protection of specific constitutional rights. *Caceres*, 440 U.S. at 753 n.14. Rather, "it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Id.* (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) and citing *Accardi*).

This eminently reasonable, pragmatic conclusion need not, in the court's view, undermine the equally reasonable articulation of the law in *Leahy* (and *Heffner*, following *Accardi*), much less the holdings in any of those cases. Rather, the agency action in *Caceres*, substantively different in rights-protecting purpose and due-process scope from the *Miranda*-like violation in *Leahy* and *Heffner* (though found in the same IRS Manual), occurred in a "situation in which no one questions that monitoring was appropriate and would have certainly received Justice Department authorization, had the request been received more promptly." *Caceres*, 440 U.S. at 757. "In these circumstances, there is simply no reason why a court should exercise whatever discretion it may have to exclude evidence obtained in violation of the regulations." *Id.* In *Caceres*, the defendant could not "reasonably contend that he relied on the regulation, or that its breach had any effect on his conduct." *Id.* at 753. But here, as in both *Heffner* and *Leahy*, the different IRS procedures at issue were promulgated to protect citizens' rights and implicate due process. As expressed by the *Heffner* Court, it is possible that had the agency complied with the procedures, the "defendant, alerted to the prosecutorial purpose of the interview, would have requested counsel." *Heffner*, 420 F.2d at 813. The breach in such cases, therefore, certainly affects, or has the potential to detrimentally affect, targets' conduct.

Nevertheless, as noted above, the *Korn* Court recently relied on *Caceres* to question the "continued validity" of *Leahy* and *Heffner*, finding that "[t]he exclusionary rule does not apply when IRS agents violate internal regulations, unless compliance with those regulations are mandated by the Constitution or statute." *Id.* at *6 (citing *Caceres* and *United States v. Boykoff*, 186 F.Supp.2d 347, 350 (S.D.N.Y. 2002)). But the *Caceres* Court's continued reliance on *Bridges* allows for the continued vitality of both *Heffner* and *Leahy*; the rule is context-specific, to be determined on a case-by-case basis. Due process was implicated in *Bridges* (and *Heffner*

and *Leahy*, neither of which, incidentally, were cited by the majority in *Caceres*, though the dissent focused on them); it was not in *Caceres*. But the approach taken in *Korn* appears typical of the broader reception of *Caceres*. *See, e.g.*, *United States v. Kim*, No.: CR 10-00171-RS, 2010 U.S. Dist. LEXIS 98269, at *15-*16 n.5 (N.D. Cal. Sept. 3, 2010) (noting that in *Caceres*, "the Supreme Court has held that, absent any statutory or Constitutional violation, the exclusionary rule is inapplicable where evidence is obtained solely in violation of an IRS regulation").

Though the court finds that this reception unnecessarily dilutes the general principle underlying the *Accardi-Bridges* body of law,[24] it need not stray from the narrower confines of the rule that has emerged from subsequent interpretation of *Caceres*. This is because, even acknowledging the First Circuit's suspicion that *Caceres* has invalidated *Leahy*, the court respectfully finds that the *Korn* court missed the intervening effect of the McDade Amendment on this analysis.[25]

---

[24] The court also takes comfort in the fact that the Tenth Circuit has relatively recently applied the *Accardi* rule entirely consistently with both *Heffner-Leahy* and *Caceres*, in a case that explicitly cites none of them aside from *Accardi* itself (also *Rosenburg* and *Lockyer*). In *Barrie v. Federal Aviation Administration*, the petitioner claimed that the agency failed to follow its own internal procedures in suspending his pilot certificate for permitting an unauthorized passenger on one of his flights (based on his differing interpretation of terms in the applicable regulation), though inspectors who observed petitioner preparing for his flight suspected at the time that he might permit the unauthorized passenger and did not discuss it with him, allowing him to take off instead and then filing affidavits in support of agency action to suspend his certificate. 16 Fed. Appx. 930, 932 (10th Cir. 2001). The Court held that "*Accardi* stands for the proposition that an agency must adhere to its own rules and regulations when an individual's due process interests are implicated. This court has indicated that the *Accardi* holding applies to regulations that exist to protect the rights of those regulated by the agency. Thus, *Accardi* would apply in this case if the federal law and FAA policies in question existed to protect the rights of aircraft operators." *Id.* at 934 (citing *Rosenburg* and *Lockyer*). The Court found that the FAA regulations in question did not exist to protect the rights of aircraft providers; "[t]he stated purpose of both handbooks [at issue] is simply to provide guidance to inspectors." *Id.* The *Barrie* Court did obliquely refer to *Leahy*, acknowledging its continued validity in the Tenth Circuit by pointing out that *Rosenburg*, like *Barrie*, had distinguished itself from a "First Circuit decision applying *Accardi* in which [the relevant] agency guideline served to protect the constitutional rights of taxpayers," an obvious reference to *Leahy*. *Id.*

[25] The Supreme Court in *Montejo* also considered the no-contact rule in passing without evaluating the effect of the McDade Amendment. 556 U.S. at 790. In its analysis overruling the rule in *Michigan v. Jackson*, 475 U.S. 625 (1986) forbidding police to initiate interrogation of a criminal defendant once he has requested counsel at an arraignment or similar proceeding. The Court laid out the well-established principle that the Sixth Amendment right to counsel "may be waived by a defendant, so

Accepting the narrowing effect of *Caceres* on the *Accardi* rule, the court must abstain from applying the exclusionary rule unless compliance with internal agency regulations is "required by the Constitution or by statute" as in *Bridges v. Wixon*. *Caceres*, 440 U.S. at 749-50. In response to the DOJ's efforts in the 1990s (in the "Thornburgh Memorandum" and subsequent regulations codified at that time at 28 C.F.R. Pt. 77) to create regulations that would exempt federal prosecutors from compliance with certain state ethics rules, notably certain aspects of the no-contact rule, Congress passed the McDade Amendment, or the Citizens Protection Act of 1999 (the "Protection Act"). 28 U.S.C. § 530B. Under the Protection Act, "an attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a).

---

long as relinquishment of the right is voluntary, knowing, and intelligent," as discussed above in Section II.C.2. *Id.* at 786. "The *only* question raised by this case, and the only one addressed by the *Jackson* rule, is whether courts must presume that such a waiver is invalid under certain circumstances." *Id.* at 787 (emphasis in original). The variation among states in how, when, and under what circumstances they appointed counsel to defendants in criminal matters complicated the analysis. The defendant proposed that "once a defendant is *represented* by counsel, police may not initiate any further interrogation." *Id.* at 786 (emphasis in original). The *Montejo* majority found this "untenable as a theoretical and doctrinal matter," *id.*, and briefly observed in *dicta* that the proposal appeared "to have its theoretical roots in codes of legal ethics, not the Sixth Amendment," citing to the no-contact rule found in Model Rule 4.2 of the American Bar Association's Model Rules of Professional conduct. *Id.* at 789. The Court stated that "the Constitution does not codify the ABA's Model Rules, and does not make investigating police officers lawyers" without any analysis of the effect of the McDade Amendment rendering violations of state ethical rules violations of federal statute as well. *Id.* The Court also criticized as broader than the Model Rule Montejo's proposal that it would "apply to all agents of the State, including the detectives who interrogated him, while the ethical rule governs only lawyers," without any analysis of the well-established "alter ego" principle under which actions of the agents are imputed to their supervising lawyers in the investigation, including as provided in Comments to the Rule itself. *Id.* This passing reference to the ethical rules and Model Rule 4.2 in particular is *dicta* because it is tertiary, at best, to the Court's main Sixth Amendment analysis in overturning *Jackson*. Moreover, its treatment of the issues surrounding the no-contact rule is incomplete to the extent of creating more confusion on the application of the no-contact rule than guidance for the present case.

Pursuant to the Protection Act, therefore, a prosecutor's failure to comply with the applicable no-contact rule is now also a violation of a federal statute. Moreover, the statute protects citizens' rights against attempts to circumvent them by federal prosecutors or other Government attorneys, thus implicating due process. In addition, "[a] Department attorney shall not direct an investigative agent acting under the attorney's supervision to engage in conduct under circumstances that would violate the attorney's obligations under section 530B." 28 CFR § 77.4 (2013).[26] In violating Utah's no-contact rule, Rule 4.2(a) Utah R. Prof. Conduct, a violation that the court has found occurred as analyzed in Section II.C.3. above, the prosecutors and agents also therefore violated the Protection Act, a *federal statute* protecting citizens' rights in precisely this situation, thereby implicating due process concerns that trigger the *Accardi* line of cases through *Caceres*.

The statutory ethics violation is also a violation of publicly known internal policies of the agencies that protect citizens' rights and implicate due process. With reference to the no-contact rule in particular, the United States Attorneys Manual provides that "[d]epartment attorneys should be guided by the relevant state's or federal district court's [no-contact] rule *and interpretations of that rule. . . .*" 9 United States Attorneys Manual § 13.296 (2013) (emphasis added).[27] The Government's implicit dismissal of the insightful Utah State Bar Ethics Advisory Opinion No. 95-05[28] is particularly curious in light of the instruction that federal prosecutors

---

[26] In citing this provision of the Code of Federal Regulations, the court acknowledges that "[t]he principles set forth [in these interpretive provisions of the CFR], and internal office procedures adopted pursuant hereto, are intended solely for the guidance of attorneys for the government." 28 CFR § 77.5 (2013). The court also uses them in this posture—as guidance to their interpretation, and not "to create a right or benefit, substantive or procedural." *Id.* This is not necessary as part of the analysis in any case in light of the McDade Amendment which makes violation of the no-contact rule a violation of a federal statute. The cited provision of the Code of Federal Regulations merely reinforces the alter-ego concept discussed in detail above in Section II.C.3.

[27] http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00296.htm (last visited Aug. 12, 2013).

[28] http://utahbar.org/rules_ops_pols/ethics_opinions/op_95_05.html (last accessed Aug. 9, 2013).

should be guided by precisely this interpretation. (*See* Pl.'s Resp. Mot. Supp. 18 n.10 [Dkt. No. 281].) The USAM also notes that "[m]ost states apply the contact rule to a represented person whether or not a complaint, indictment, or other charging instrument has been filed." *Id.* at § 13.296(B). By contrast, the Government argued forcefully against this notion, contending that *Ryans* unequivocally pegs the applicability of the Rule to the indictment, i.e. the formal initiation of the adversarial judicial process. It is also worth highlighting that the USAM instructs prosecutors that "[i]t is the lawyer's consent, not the client's, that is required to authorize contact with a represented person." 9 United States Attorneys Manual § 13.296(E)A. This corresponds to *Thomas* and Comment [4] to Rule 4.2 of the Utah Rules of Professional conduct, both cited above in Section II.C.3. Most tellingly, however, the USAM specifically outlines the "overt communications" that are permissible with "represented persons":

> Overt Communications with Represented Person—Circumstances Not Covered by the Contact Rule
>
> A Department attorney may communicate directly, or may cause another to communicate, with a represented person concerning the subject matter of the representation in the following circumstances.
>
> A. The communication is limited to determining whether the person is in fact represented by counsel concerning the subject matter of the investigation or proceeding.
> B. The communication is made pursuant to discovery procedures or judicial or administrative process in accordance with the orders or rules of the court or other tribunal where the matter is pending, including but not limited to testimony before a grand jury or the taking of a deposition, or the service of a grand jury or trial subpoena, summons and complaint, notice of deposition, administrative summons or subpoena, or civil investigative demand.

*Id.* at § 13.297.[29] These procedures were openly violated by the joint prosecution-investigation team in this case, particularly after Defendant revealed in the first interview that Mr. Wheeler and Mr. Skousen had never ceased representing him. And the USAM specifically provides that

---

[29] http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00297.htm (last visited Aug. 12, 2013).

prosecutors will be responsible for the actions of agents "working under their supervision" if they "order the conduct or, after becoming aware of the misconduct, approve or ratify it." *Id.* at § 13.298.[30] AUSA Walz confirmed his awareness of these important procedures applicable under the no-contact rule (and thereby enforced by federal statute) and the operative USAM. He explained that it was his "practice" to work through counsel of represented targets and in the U.S. Attorney's Office "when we know someone is represented . . . our practice, at least in white collar matters . . . [is] not to go to a target or even a witness without going through the attorney." (Tr. Ev. Hrg. 11/08/12, at 196:15-197:2 [Dkt. No. 301].) This "practice" is surely a result of the applicable ethics rule and statute, and the internal agency procedures published in the USAM.

The agents working under AUSA Walz's supervision in this investigation had independent guidance as to the importance of the no-contact rule and its requirements. Agent Saxey admitted this, stating to Defendant during the first interview, "Rick, you were represented for a while, and we're not permitted to talk to you, but in the future I plan on talking to you about what information you might have." (Tr. 2/13/09 Int., attached as Ex. 10 to Mumford Decl., at 38.) This prompted Defendant's objection to the suggestion that he was not represented and therefore the agents could speak to him then and in the future. Not a lawyer, Defendant apparently believed that the agents were permitted to speak to him as long as AUSA Walz had authorized it even though Defendant had not been able to reach Mr. Wheeler before agreeing to voluntarily appear for the first interview. (*See* Tr. Ev. Hrg. 11/08/2012, at 24:10-11 [Dkt. No. 301].)

Agent Marker, as the investigating IRS agent, was subject to the same agency procedures safeguarding citizens' rights and hedging against due process concerns that were at issue in

---

[30] http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00298.htm (last visited Aug. 12, 2013).

*Heffner* and *Leahy*. The IRS Manual provides that "the special agent will always inform the subject of his/her constitutional rights at the beginning of a formal question and answer interview, even if the subject had previously been advised." IRS Manual § 9.4.5.11.3.1(3) (05-15-2008).[31] It lays out the disclosures and statements an investigating IRS agent must make "[a]t the start of the initial interview with the subject of an investigation." *Id.* at § 9.4.5.11.3.1.1 (02-01-2005). These include the *Miranda*-like "noncustodial statement of rights" that Agent Marker read to Defendant in advance of the March 2007 interview, including the statement, "I advise you further that you may, if you wish, seek the assistance of an attorney before responding." *Id.* at § 9.4.5.11.3.1.1(2). But the Manual also provides that "[d]uring subsequent contacts with the subject, the subject should be advised of his/her constitutional rights before questioning" as well. *Id.* at § 9.4.5.11.3.1.1(2). Agent Marker did not refresh this noncustodial statement of rights at the beginning of either interview. The court finds it likely that, had Agent Marker complied with the agency's established procedures, Defendant, "alerted to the prosecutorial purpose of the interview, would have requested counsel." *Heffner*, 420 F.2d at 813. Defendant can "reasonably contend that he relied on the regulation" and "that its breach [affected] his conduct." *Caceres*, 440 U.S. at 753.

The prosecutors' and investigators' statutory violation of the no-contact rule and concurrent departure from internal policies of the DOJ, FBI, and IRS that protect citizens' rights denied Defendant due process under *Accardi* and its progeny. "The exclusionary rule mandates suppression of evidence garnered in contravention of a defendant's constitutional rights and protections. The rule is thus intended to: deter improper conduct by law enforcement officials; preserve judicial integrity by insulating the courts from tainted evidence; and maintain popular trust in the integrity of the judicial process. Anything short of exclusion . . . would be 'worthless

---

[31] http://www.irs.gov/irm/part9/irm_09-004-005-cont01.html#d0e783 (last visited Aug. 12, 2013)

and futile' in securing the rule's goals." *Hammad*, 858 at 840 (internal citations omitted).

Moreover, "[t]hese same needs arise outside the context of constitutional violations. The

principles governing the admissibility of evidence in federal criminal trials have not been

restricted to those derived solely from the Constitution. Hence, the exclusionary rule has

application to governmental misconduct which falls short of a constitutional transgression." *Id.* at

840-41 (internal quotation marks, alterations, and citations omitted). "Indeed, suppression may

even be ordered for violations of administrative regulations." *Id.* at 841 (citing *Caceres*).

      The *Hammad* Court found that the exclusionary rule would apply to a violation of the no-

contact rule "pursuant to the federal courts' supervisory authority." *Id.* (holding, however, that

suppression was inappropriate in that particular case because the "law was previously unsettled

in this area"). The law is now long-settled in this area, particularly in the Tenth Circuit where

*Thomas* has been law since 1973. The prosecutors and investigators in this case had the benefit

of substantial precedent and detailed internal procedures safeguarding citizens' rights in this

area. "The decision as to the exclusionary implications of a violation of the [internal agency]

procedure is [the court's], and based on [its] sense of the duties and rights so created." *Leahy*,

434 F.2d at 10. Suppressing the two interviews and all fruit derived therefrom is necessary here

to protect Defendant's due process rights. And, from a policy perspective, excluding the

evidence under the circumstances of this case will help overcome a natural disincentive within

the agencies involved to monitor the conduct of their attorneys and agents and ensure their

compliance with internal procedures that protect citizens' rights and implicate due process. In

addition, suppression in this case will help prevent the erosion of "citizens' faith in the even-

handed administration of the laws." *Id.* Accordingly, the court excludes Defendant's statements

from both the first and second interviews and all fruits derived therefrom.

## CONCLUSION

The court DENIES the Government's Motion to Reconsider (Dkt. No. 349) but simultaneously vacates as moot, in the interest of judicial economy, its May 31, 2013 Order (Dkt. No. 345) compelling the reopening of the evidentiary hearing and the production of the materials as to which the Government waived its asserted privilege.

The court GRANTS Defendant's Motion to Suppress (Dkt. No. 258).

The court also therefore VACATES as moot Defendant's Motion to Compel (Dkt. No. 346) and TERMINATES the Government's Motion in Limine (Dkt. No. 292) as moot.

SO ORDERED this 15th day of August, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge